COURT OF APPEALS OF VIRGINIA

Present:  Judges Kelsey, Haley and Senior Judge Bumgardner
Argued at Richmond, Virginia


COMMONWEALTH OF VIRGINIA AND
  COMMONWEALTH OF VIRGINIA,
  DEPARTMENT OF TRANSPORTATION

v.      Record No. 2061-08-2
                                                          OPINION BY
AMEC CIVIL, LLC                               JUDGE D. ARTHUR KELSEY
                                                          JUNE 16, 2009
AMEC CIVIL, LLC

v.      Record No. 1961-08-2

COMMONWEALTH OF VIRGINIA AND
  COMMONWEALTH OF VIRGINIA,
  DEPARTMENT OF TRANSPORTATION


FROM THE CIRCUIT COURT OF MECKLENBURG COUNTY
Charles E. Poston, Judge Designate

Richard Tyler McGrath, Senior Assistant Attorney General
(Robert F. McDonnell, Attorney General; Maureen Riley Matsen,
Deputy Attorney General; Randall H. Wintory, Assistant Attorney
General; William R. Mauck, Jr.; Stephen G. Test; Matthew S.
Sheldon; Williams Mullen, on briefs), for the Commonwealth of
Virginia and the Commonwealth of Virginia, Department of
Transportation.

Gregory S. Martin (Brian P. Heald; Roger C. Brown; J. William
Watson, Jr.; Moye, O'Brien, O'Rourke, Pickert & Martin, LLP;
Watson & Morrison, P.C., on briefs), for AMEC Civil, LLC.


Pursuant to Code § 33.1-387, AMEC Civil, LLC filed suit against the Virginia

Department of Transportation (VDOT) for cost overruns on a government contract.[1]  In

response, VDOT argued AMEC failed to provide timely "written notice of its intention to file

---

[1] AMEC is the successor-in-interest to Morse Diesel Civil, LLC, the original contractor.

such claim" when the problems arose during the management of the contract — a statutory requirement under Code § 33.1-386(A). VDOT also challenged several of AMEC's claims as unrecoverable under the contract and some aspects of AMEC's claimed damages as unavailable as a matter of law.

The circuit court rejected all of VDOT's arguments and awarded AMEC a general verdict of $21,181,941, the entire amount AMEC sought at the time of trial. AMEC requested, but the court disallowed, an award of prejudgment interest. The parties' cross-appeals bring each of these issues to us for review. We reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.

I.

In 2000, VDOT awarded AMEC a contract for the construction of the Route 58 Clarksville Bypass in Mecklenburg County. The contract price, approximately $72.5 million, included widening four miles of roadway, constructing interchanges and overpasses, and building four new bridges, the largest spanning the John H. Kerr Reservoir. The contract called for completion of the project in November 2003. The contract's actual completion occurred in 2005. During the five-year project, AMEC encountered difficulties meeting deadlines and completing tasks within its original cost estimates.

After the completion of the project, AMEC requested an additional $24 million in cost overruns. Though bundled as a single administrative claim, AMEC's request for damages included over a dozen specific allegations arising out of various aspects of the five-year project. When VDOT rejected AMEC's administrative claim, AMEC filed suit in the circuit court. In its amended complaint, AMEC alleged damages caused by:

- "differing site conditions" involving the drilled shaft work on the Kerr Reservoir bridge, Amended Complaint ¶¶ 36-63,

- 2 -

- high lake water levels in the Kerr Reservoir, id. ¶¶ 64-71,

- Work Orders 4, 6, 7, 12, and 16 authorizing deadline extensions, id. ¶¶ 72-80,[2]

- work performed during two "winter periods," id. ¶¶ 81-89,

- "differing site conditions" involving "boulders at the B640 bridge," id. ¶¶ 90-95,

- work site interference from "overhead power lines" at bridge B641, id. ¶¶ 96-104,

- problems with the "drilled shaft concrete mix design," id. ¶¶ 105-16,

- replacing the pier 17 foundation cap on the Kerr Reservoir bridge, id. ¶¶ 117-22,

- a pier cap plan error involving pier 23 on the Kerr Reservoir bridge, id. ¶¶ 123-27,

- shaft layout problems with pier 18 on the Kerr Reservoir bridge, id. ¶¶ 128-33,

- repair to a pier 2 column on bridge B643, id. ¶¶ 134-36, and

- acceleration efforts, id. ¶¶ 144-50.

Seeking damages for each of these claims, AMEC relied on Code § 33.1-387. Under the statute, a government contractor may institute a "civil action" claiming damages "under the contract" so long as (i) the civil action seeks only "costs and expenses" caused by VDOT, and (ii) the contractor submits its claim to VDOT "within the time and as set out" in Code § 33.1-386, which "shall be a condition precedent" to filing suit. Only administrative claims submitted to VDOT, and denied by it, can be asserted in the civil action. See Commonwealth v.

_____

[2] Prior to trial, the circuit court dismissed AMEC's claim relating to Work Order 12. AMEC has not appealed this ruling.

Yeatts, Inc., 233 Va. 17, 20, 353 S.E.2d 717, 719 (1987) (noting the statute authorizes a civil action "for any portion of the claim" denied by VDOT).[3]

In its responsive pleadings, VDOT asserted that AMEC failed "to satisfy legal and contractual conditions precedent to the initiation of legal action" and failed to "exhaust administrative remedies." Prior to trial, VDOT filed a "Motion for Leave to File Pleas in Bar." The pleas in bar contended that many of AMEC's claims violated Code § 33.1-386(A), which authorizes the assertion of an administrative claim "provided that written notice of the contractor's intention to file such claim shall have been given to the Department at the time of the occurrence or beginning of the work upon which the claim and subsequent action is based." VDOT proffered that AMEC never provided timely, written notice of its intention to file many of the claims asserted in the civil action.[4]

AMEC resisted the motion for leave on several grounds, including the assertion that the pleas in bar would involve a "full blown evidentiary hearing, based on a year's worth of voluminous discovery, which will properly occur at trial anyway." AMEC Brief in Response to VDOT's Motion for Leave to File Pleas in Bar at 6. For this reason, AMEC argued, "a full and fair determination of whether notice was provided is best suited for trial." Id. at 8.

On December 13, 2007, the circuit court held a hearing on VDOT's motion for leave. Without addressing the merits of the underlying pleas, the court held the motion for "leave to file

---

[3] For this reason, we do not address AMEC's allegation that VDOT breached a "duty of good faith" by refusing to grant "time extensions," by "blaming" AMEC for the lack of progress, by expressing "indifference" to settlement, or by rejecting AMEC's claim "in bad faith." Amended Complaint ¶¶ 137-43. AMEC did not assert a breach of any "duty of good faith" in its administrative claim.

[4] VDOT also asserted AMEC similarly violated a provision of the contract which VDOT interpreted to require a written statement of the "claimed damage" during, but not after, the period of contract performance. See VDOT Road and Bridge Specification § 105.16.

pleas in bar will be denied." On January 23, 2008, the court entered a written order denying

VDOT's motion for leave to file the pleas in bar.[5] About a month later, the parties received a

letter opinion from the circuit court addressing the merits of the pleas in bar which the court

earlier held could not be filed. The letter began with a reference to "oral argument" on "July 10,

2007" and ended with this conclusion: "Accordingly, the court finds that AMEC's actual notice

was sufficient enough to satisfy the statutory and written notice provisions a[t] issue." AMEC

Civil, LLC v. Commonwealth, 74 Va. Cir. 492, 507 (2008).

With respect to the statutory written notice requirement, the circuit court held that

"AMEC did not provide VDOT with written notice of its claims as required by Va. Code Ann.

§ 33.1-386." Id. at 500; see also id. at 504 ("although AMEC did not fully comply with the

written notice requirement of Va. Code Ann. § 33.1-386"); id. at 506 (noting "AMEC's failure to

abide by the statute's written notice provision"). AMEC's failure to provide written notice did

not matter, the court reasoned, because VDOT had "actual notice." Id. at 506. Actual notice,

whether written or not, satisfied the court's "liberal construction" of the statute. Id. at 499.[6]

---

[5] The circuit court granted leave to VDOT to file a summary judgment motion asserting that statutory and contractual written notice requirements mandated the dismissal of various AMEC claims. At the hearing on January 23, 2008, the court denied the motion without "ruling on the merits," deciding instead "to wait until trial" to resolve the contested issues. The court memorialized that ruling in a written pretrial order entered February 20, 2008.

[6] The court addressed the analogous contractual written notice requirement, see n.4, *supra*, by finding that the "lack of written notice, standing alone, does not contractually preclude AMEC from properly bringing claims against VDOT." AMEC, 74 Va. Cir. at 497. In the alternative, the court *sua sponte* held VDOT "implicitly waived" the contractual written notice requirement, id. — a point not raised, briefed, or argued by either party. On appeal, AMEC concedes "this was not an argument AMEC asserted during motion practice or trial." AMEC Appellee Br. at 18 n.9 (No. 2061-08-2). "Nor does AMEC rely upon 'waiver' now." Id. "AMEC is *not* asserting that any notice provisions were waived." Id. at 15 n.7 (emphasis in original). We accept AMEC's concession. See Billups v. Carter, 268 Va. 701, 709, 604 S.E.2d 414, 419 (2004) ("We adhere to the rule that the principles of waiver and estoppel do not apply to the Commonwealth and that when acting in its governmental capacity it cannot be bound by

VDOT filed a motion for reconsideration pointing out that no hearing had been held on "July 10, 2007" as the court's letter opinion stated.[7] More important, VDOT argued, the letter opinion "contained findings of fact and conclusions of law on issues on which no evidence has been taken" and concluded with a judicial ruling on pleas in bar "which the Court did not allow VDOT to file." A few days later, the trial court entered an order denying without comment VDOT's motion to reconsider.

At trial, VDOT repeated its assertion that the lack of written notice barred many of AMEC's claims. When VDOT raised the point during its motion to strike, the circuit court held the issue had already been decided pretrial. "The motion on actual notice as a substitute for written notice has already been ruled on," the court continued, "I don't need to hear another thing about it."

After trial, the court issued a short letter stating it would enter a "general verdict" in favor of AMEC for $21,181,941, the entire amount of AMEC's request at trial. See Letter Opinion at 1 (July 1, 2008). The court refused AMEC's request for prejudgment interest. Reaffirming its pretrial ruling on VDOT's unfiled pleas in bar, the court stated that every "factual assumption" made in its pretrial ruling turned out to be true. Id. at 2. The court did not identify any specific exhibits or witnesses supporting this conclusion. The court instead referred generally to "memoranda addressing the issues" and "minutes" of meetings. Id. These unspecified documents, the court held, provided whatever "written notice" AMEC was required to give during the period of contract performance. Id.

---

the unauthorized acts or representations of its employees and agents.") (citing, among other cases, Main v. Dep't of Highways, 206 Va. 143, 150, 142 S.E.2d 524, 529 (1965), which refused to apply waiver or estoppel to notice provisions of a highway contract).

[7] The record does not contain any hearing conducted on July 10, 2007. VDOT's motion for leave to file pleas in bar was not filed until December 2007.

II.

The cross-appeals in this case raise an array of issues, with the resolution of some mooting the need to resolve others. We believe the dispute on appeal can be clustered into four principal subjects:

A. TIMELY, WRITTEN NOTICE OF AMEC'S INTENTION TO FILE CLAIMS PURSUANT TO CODE § 33.1-386(A).

B. VDOT'S CONTRACTUAL CHALLENGE TO SEVERAL OF AMEC'S CLAIMS.

C. VDOT'S CHALLENGE TO THE TRIAL COURT'S DAMAGE AWARD.

D. AMEC'S REQUEST FOR PREJUDGMENT INTEREST.

Our holdings on the issues we address render it unnecessary to offer advisory opinions on the issues we do not address. "In this case, as in all others, we seek to decide cases 'on the best and narrowest ground available' from the record." Kirby v. Commonwealth, 50 Va. App. 691, 698 n.2, 653 S.E.2d 600, 603 n.2 (2007) (citations omitted).

A. TIMELY, WRITTEN NOTICE OF AMEC'S INTENTION TO FILE CLAIMS PURSUANT TO CODE § 33.1-386(A)

Under Code § 33.1-387, a government contractor may file a civil action against the Commonwealth for any claim "under the contract" that has been submitted to, and denied by, VDOT. This statute must be "strictly construed" by the courts. XL Specialty Ins. Co. v. Commonwealth, 269 Va. 362, 371, 611 S.E.2d 356, 361 (2005). This principle of strict construction follows a long and unbroken tradition in Virginia law. See Sabre Constr. Corp. v. County of Fairfax, 256 Va. 68, 73, 501 S.E.2d 144, 147 (1998) ("The Public Procurement Act constitutes a waiver of public bodies' sovereign immunity, is in derogation of the common law, and, therefore, must be strictly construed."); Halberstam v. Commonwealth, 251 Va. 248, 252,

- 7 -

467 S.E.2d 783, 785 (1996) (holding that the "notice provisions of the Virginia Tort Claims Act" must be "strictly construed" by the courts). It is thus fair to say, as most commentators do, that "strict compliance with notice of claim requirements has become the clearly established rule." Robert K. Richardson, Notice of Claim Requirements under the Virginia Public Procurement Act:  Owner's Friend — Contractor's Nightmare, 48 Va. Lawyer 34, 36 (October 1999); see also 14 Michael A. Branca & Mark R. Berry, Virginia Practice Series: Construction Law § 6:6, at 174 (2008-09) ("Virginia courts have made clear that the notice requirements of the VPPA are strictly applied, and cannot be relaxed or waived by the public body.").

Under Code § 33.1-387, a prior administrative claim "as set out" in § 33.1-386 "shall be a condition precedent" to the contractor's right to bring a civil action. When a statute imposes a "condition precedent" on a suit against the Commonwealth, that limitation "is not merely a procedural requirement, but a part of the newly created substantive cause of action." Sabre Constr., 256 Va. at 72, 501 S.E.2d at 147 (citation omitted); cf. Hallstrom v. Tillamook County, 493 U.S. 20, 31 (1989) (holding the legislature's "mandatory conditions precedent to commencing suit" may not be disregarded as mere technical requirements). It is not an affirmative defense obligating the Commonwealth to disprove the occurrence of the condition but rather an element of the *prima facie* case on which the plaintiff has the burden of proof.

Code § 33.1-386(A) authorizes a contractor to submit an administrative claim to VDOT seeking damages "under the contract." The statute, however, includes an important proviso. The administrative claim must "set forth the facts upon which the claim is based, *provided* that *written notice* of the contractor's intention to file such claim *shall* have been given to the Department *at the time* of the occurrence or beginning of the work upon which the claim and subsequent action is based." Code § 33.1-386(A) (emphasis added).

In its pretrial ruling, the circuit court held that "AMEC did *not* provide VDOT with written notice of its claims as required by Va. Code Ann. § 33.1-386." AMEC, 74 Va. Cir. at 500 (emphasis added); see also id. at 504 (acknowledging "AMEC did not fully comply with the written notice requirement of Va. Code Ann. § 33.1-386"); id. at 506 (noting, but finding unimportant, "AMEC's failure to abide by the statute's written notice provision"). The court dismissed the statutory default as an inconsequential technicality because VDOT had "actual notice" of AMEC's claims. Id. at 503, 506.

In its post-trial ruling, the court reaffirmed its pretrial ruling that "actual notice was an acceptable substitute for written notice." Letter Opinion at 1 (July 1, 2008). The court added, however, a few sentences offering an alternative holding: From "minutes" of meetings and "memoranda" exchanged between the parties, VDOT "*also* had written notice of the plaintiff's claims." Id. at 2 (emphasis added). On several levels, we disagree with both the circuit court's pretrial and post-trial rulings.

To begin with, the circuit court's pretrial ruling began its statutory analysis under the heading, "Legal Function Trumps Legal Form," and ended on a similar note, "legal form must yield to the interests of legal function." AMEC, 74 Va. Cir. at 499, 506. Our statutory analysis begins and ends with a less ambitious premise: "We can only administer the law as it is written." Uninsured Employer's Fund v. Wilson, 46 Va. App. 500, 506, 619 S.E.2d 476, 479 (2005) (citation omitted). The one canon that precedes all others is "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006) (citation omitted). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" Barnhart v. Sigmon Coal Co., 534 U.S. 438, 462 (2002) (citation omitted).

Governed by the "well-settled law that courts do not engage in rewriting statutes," George v. Commonwealth, 276 Va. 767, 773, 667 S.E.2d 779, 782 (2008), neither we nor the circuit court have the power to excise the "written notice" requirement out of Code § 33.1-386(A) or to discount it as an aberrant formalism ill-suited for the function intended. "Judicial review does not evaluate the 'propriety, wisdom, necessity and expediency' of legislation." Laurels of Bon Air, LLC v. Med. Facilities of Am. Living, LP, 51 Va. App. 583, 599, 659 S.E.2d 561, 569 (2008) (citation omitted). When a statutory text speaks clearly on a subject, "effect must be given to it regardless of what courts think of its wisdom or policy." Temple v. City of Petersburg, 182 Va. 418, 423, 29 S.E.2d 357, 358 (1944).

Code § 33.1-386(A) states the contractor "shall" provide "written notice" of its intention to later file a claim. The circuit court erred in finding that anything other than written notice would suffice. See Main v. Dep't of Highways, 206 Va. 143, 149-50, 142 S.E.2d 524, 529 (1965) (rejecting actual notice argument and enforcing contractual requirement that contractor "give notice in writing of his intent to claim" damages). Accord Haley v. Haley, 272 Va. 703, 707, 636 S.E.2d 400, 402 (2006) (holding "actual notice" does not satisfy the written notice requirements for claiming an elective share under Code § 64.1-13); Halberstam, 251 Va. at 251-52, 467 S.E.2d at 785 (holding "actual notice" is insufficient to satisfy the written notice requirement of the Virginia Tort Claims Act); Town of Crewe v. Marler, 228 Va. 109, 113-14, 319 S.E.2d 748, 750 (1984) (holding Town's "actual notice" of an accident did not remove the injured party's duty to provide written notice under Code § 8.01-222). "To permit 'actual notice' to suffice" when the governing statute requires written notice "would create an exception that has no basis in the text of the statute." Haley, 272 Va. at 708, 636 S.E.2d at 402 (interpreting written notice provision of Code § 64.1-13).

As to what the written notice must say, Code § 33.1-386(A) requires a particular kind of notice given at a particular point in time. To comply with Code § 33.1-386(A), the writing must announce "the contractor's *intention to file such claim*" with VDOT "at the time of the occurrence or beginning of the work upon which the claim and subsequent action is based." (Emphasis added.) This unique notice is not a mere heads-up about an ongoing problem with the contractor's ability to perform. Nor is it a status report on the myriad difficulties discussed during the management of the contract. As was true in this case, most complex government contracts generate an avalanche of such documentation.

A written notice under Code § 33.1-386(A) differs from the mass of ordinary documentation by conspicuously declaring that, at least in the contractor's view, a serious legal threshold has been crossed.[8] Signaling discontent with the agreed contract pricing, the contractor declares its intent to assert an administrative claim for damages that, if rejected, could result in the assertion of a civil action against the contracting agency in the courts. Once hopeful of an on-time, on-budget, conflict-free contract, the parties find themselves traveling the path toward litigation. Knowing when a particular dispute has started down that path can be crucial. A contracting agency may need to make difficult judgments about continued management of the contract. And, depending on the magnitude of the dispute, the agency may also need to calibrate the effect a threatened claim might have on its limited procurement budgets.

That said, Code § 33.1-386(A)'s written notice proviso does not require the sophistication of a legal pleading. Any document can suffice if it clearly and timely states the contractor's

---

[8] That was certainly true of this contract. During the course of the project, AMEC sent VDOT over five hundred serialized letters addressing various concerns. Only a handful announced AMEC's intention to escalate an ongoing issue into an administrative claim. In one letter, AMEC stated its intention to file a claim only to later expressly withdraw the notice when it "decided that the extent of this claim did not escalate and therefore AMEC is withdrawing this claim." AMEC Serial Letter No. 161, withdrawing AMEC Serial Letter No. 100.

intention to later file an administrative claim.[9]  The leading Virginia case on this subject, <u>Flory</u>

<u>Small Bus. Dev. Ctr. v. Commonwealth</u>, 261 Va. 230, 541 S.E.2d 915 (2001), enforced an

identical written notice requirement of the Public Procurement Act, Code § 2.2-4363, formerly

Code § 11-69(A).[10]  In <u>Flory</u>, a dispute arose between a contractor and an agency over whether

the agency should pay for services performed by the contractor prior to signing the contract.  Six

months later, after providing services, the contractor sent invoices demanding payment.

<u>Flory</u> held that the contractor's invoices, while arguably a written notice of intent to make

a claim, came too late because they had not been issued at the "time of the occurrence or

beginning of the work upon which the claim is based."  <u>Id.</u> at 238-39, 541 S.E.2d at 919-20.  And

the dispute over payment six months earlier, while arguably timely, made the agency generally

aware of the contractor's position but did not specifically "inform" the agency that the contractor

"*intended to claim reimbursement*" for the disputed services.  <u>Id.</u> (emphasis added).  It was not

enough that the contracting agency could have intuited the contractor's intent to file a claim

based upon the nature of the dispute.  The intent to file the claim had to be express, timely, and

in writing.  Because the statute established "mandatory, procedural requirements which must be

met in order for a court to reach the merits of a case," <u>id.</u> at 238, 541 S.E.2d at 919, these

omissions defeated the contractor's civil action as a matter of law.  <u>Compare</u> <u>Flory</u>, 261 Va. at

---

[9] For purposes of our analysis, we assume *arguendo* that "minutes of a progress meeting" can constitute a statutorily compliant "written notice" if the written minutes specifically record the contractor's assertion of its intent to file a claim.  <u>See</u> <u>Welding, Inc. v. Bland County Serv. Auth.</u>, 261 Va. 218, 227, 541 S.E.2d 909, 914 (2001) (interpreting identical language in the Public Procurement Act, Code § 2.2-4363 (formerly Code § 11-69(A))).

[10] The General Assembly copied the requirement of a "written notice" of an "intention to file such claim" from Code § 33.1-386(A) and incorporated it verbatim into the Public Procurement Act, Code § 2.2-4363, formerly Code § 11-69(A).  <u>See</u> Virginia Procurement Law Study of Senate Joint Resolution 148, 1979 Session, at 51 (1980) ("The language in subsection (a) [of former Code § 11-69] is derived from Section 33.1-386.").  We construe these two synonymous provisions the same way.

239, 541 S.E.2d at 920 ("[W]e hold that the trial court did not err in dismissing the Center's motion for judgment with prejudice, and we will affirm the judgment of the trial court."), with AMEC, 74 Va. Cir. at 500 (asserting that the "Flory Court . . . held that the plaintiff's claim could not be dismissed for failing to comply with the written statutory notice requirement").

Under Flory, each written notice of intent must be examined individually. "By identifying more than one event that triggers the filing of an intent to file a claim, the statute acknowledges that not all claims will arise under the same circumstances." Flory, 261 Va. at 238, 541 S.E.2d at 919. It necessarily follows that the "timing and form" of a putative notice of intent "requires an examination of the circumstances of each case." Id. Guided by these principles, we review on appeal each of AMEC's claims that VDOT contends did not satisfy the written notice requirement of Code § 33.1-386(A).

- *Claim Involving Drilled Shaft Work*

This claim involved difficulties AMEC encountered while performing the drilled shaft work for the Kerr Reservoir bridge. Various letters and meeting minutes, some as early as 2000, showed that AMEC and VDOT knew of problems associated with this aspect of the project. In 2001, despite these concerns, AMEC began the drilled shaft work on the Kerr Reservoir bridge. AMEC waited until 2003 — two years after beginning the drilled shaft work — to provide its first written notice of an intention to assert a claim. By that time, AMEC had completed about 85% of the drilled shaft work on the bridge.

As in Flory, the earlier exchange of documents concerning the problems with the drilled shaft work did not comply with Code § 33.1-386(A)'s requirement that the notice announce the contractor's intention to file an administrative claim for damages. AMEC's 2003 written notice, while clearly announcing such an intention, was untimely because it came long after "the time of

the occurrence or beginning of the work upon which the claim and subsequent action is based." Code § 33.1-386(A).[11]

- *Claim for Defects in the Drilled Shaft Concrete Specification*

During the drilled shaft work, AMEC encountered problems with the concrete mix it used in an effort to comply with the applicable contractual specification. In its administrative claim, AMEC asserted the specification was defective and VDOT should have known about it. No evidence at trial, however, showed that AMEC ever provided any written notice during the performance of the contract of an intention to later file a claim for damages caused by the allegedly defective concrete specification.[12]

- *Claim for Concrete Formwork for Foundation Caps, Piers & Columns*

In its administrative claim, AMEC sought damages for work associated with setting and stripping concrete formwork for foundation caps, piers, and columns. At no point during the contract performance, however, did VDOT ever receive written notice of AMEC's intention to file independent claims for these alleged additional costs.[13]

---

[11] On appeal, VDOT also contends the circuit court erred by not barring the drilled shaft claim under accord and satisfaction principles. Our holding makes it unnecessary to address this issue. We similarly need not pass judgment on AMEC's assertion, or VDOT's argument in rebuttal, that VDOT's "superior knowledge" of the underlying problem (allegedly obtained from another project which experienced similar problems) implied a contractual duty on VDOT's part to notify AMEC of all foreseeable difficulties associated with this aspect of the project.

[12] Our holding renders it unnecessary to address VDOT's alternative argument that, even if AMEC had complied with Code § 33.1-386(A), no viable claim existed because the concrete mix requirements constituted a performance, not a design, specification. See, e.g., P.R. Burke Corp. v. United States, 277 F.3d 1346, 1357 (Fed. Cir. 2002); Conner Bros. Constr. Co. v. United States, 65 Fed. Cl. 657, 685 (2005). In addition, as was the case with the drilled shaft claim, we do not examine the merits or demerits of AMEC's "superior knowledge" assertion. See n.11, *supra*.

[13] VDOT's opening brief addressed this issue specifically. See VDOT Opening Br. at iii & 19-20 (No. 2061-08-2). AMEC's brief in response does not address the issue.

▪ *Claim for Pier 17 Foundation Cap Repair*

In December 2002, AMEC began constructing a foundation cap for pier 17 at the Kerr Reservoir bridge. Lake water leaked into the form during the concrete pour. The water weakened the concrete and rendered the foundation cap defective. AMEC eventually had to demolish the defective cap and replace it with a new one.

At trial, an AMEC witness testified that an unidentified AMEC representative, on an unspecified date, verbally informed VDOT of AMEC's intention to file a claim for damages arising out of the extra work associated with the pier 17 foundation cap repair. VDOT denied any such conversation took place. The record contains no written notice from AMEC to VDOT that can be reasonably interpreted as stating any intention by AMEC to file a claim based upon the repair work to pier 17's foundation cap.[14]

▪ *Claim for Work Authorized by Work Orders 4, 6, 7 & 16*

The contract anticipated the need for additional work not specified in the bid or award. When the need arose, the contract authorized the issuance of a work order after the parties reached agreement on what was to be done, when it would be done, and at what additional cost.[15] Over sixty work orders were issued during the project.

Work Orders 4, 6, 7, and 16 collectively authorized additional work, compensated AMEC at contractual unit prices, and extended the project completion date. When AMEC and VDOT agreed to these work orders, AMEC made no written request for any compensation other than the

---

[14] VDOT also argues that, as a matter of law, AMEC failed to establish any contractual basis for this claim even if it had been the subject of a timely, written notice under Code § 33.1-386(A). See VDOT Opening Br. at 30-31(No. 2061-08-2). We need not decide this question given our holding.

[15] The contract also authorized "force account" work in which VDOT orders the contractor to perform specific tasks. See Specification § 109.05. Work Orders 4, 6, 7, and 16 were not "force account" orders.

unit pricing specified in the contract. Nor did AMEC at that time communicate in writing any intention to later file a claim seeking damages related to these work orders. AMEC claimed it provided written notice in July 2004, see Trial Ex. D-135, at 7-8, but that notice came after commencement of the work authorized by Work Orders 4, 6, 7, and 16.[16]

- *Claim for Acceleration Damages*

On various aspects of the job, AMEC accelerated its efforts to keep on track with expected timelines. AMEC claimed this accelerated effort began in January 2002.

In 2003, one of AMEC's representatives engaged VDOT "in a talking process" concerning AMEC's acceleration efforts. The first written notice of any intention to assert an acceleration claim came in April 2004. This notice announced an intent to file a claim for damages "incurred to date" for *prior* acceleration efforts (work commenced before April 2004) not "correctly and fully addressed by Work Order No. 39." AMEC's later administrative claim sought damages for acceleration efforts commenced before and after the April 2004 notice.

- *Claim for Damages During the First Winter Period*

The original contract term of performance contemplated three winter periods from 2000 to 2003. Anticipating the possibility of an extension of the completion date, VDOT Road and Bridge Specification § 108.09(b) provided that delays caused by "unforeseen causes" pushing work into later winter seasons could render winter working conditions "unsuitable" for completing the job. If that occurred, "consideration *may* be given to granting an extension of

---

[16] Work Orders 6 and 7 stated that AMEC agreed to perform "the work described herein and at the unit prices set forth" and that VDOT agreed to grant the extension and compensate AMEC on a "unit price" basis. On appeal, VDOT reasserts its accord-and-satisfaction argument made at trial. See VDOT Opening Br. at 38-40 (No. 2061-08-2). We need not address this issue given our holding.

time that will encompass a suitable period during which such work can be expeditiously and acceptably performed." Id. (emphasis added). [17]

In March 2003, AMEC provided VDOT with written notice of its intent to claim damages for the winter extension from November 30, 2003, to April 1, 2004 (the "first winter period"). This first winter period extension was necessary, AMEC stated, given the time extensions previously granted by VDOT in Work Orders 6, 7, 12, and 16. VDOT acknowledged receipt of the written notice and directed AMEC to keep daily records of its work and actual costs during the extension period.[18]

*    *    *    *    *    *    *

With respect to this last item, AMEC's claim for damages during the first winter period, the circuit court correctly held AMEC's March 2003 written notice informed VDOT in a timely manner of AMEC's intent to claim damages.[19]

As for AMEC's acceleration claim, it turns on the timing and scope of the April 2004 written notice. This notice was untimely as to acceleration efforts prior to April 2004 but timely as to acceleration efforts after April 2004 to the extent they were reasonably attributable to contractually compensable delays not "correctly and fully addressed by Work Order No. 39." On remand, the circuit court should determine whether any such post-notice efforts existed

---

[17] We cite to VDOT's Road and Bridge Specifications existing at the time of the contract. VDOT amended these Specifications in 2007 and began using the amended version in 2008.

[18] VDOT does not assert on appeal any written-notice challenge to AMEC's claim for damages arising out of the "second winter period." Instead, VDOT challenges the "second winter period" claim (as well as the first) as unrecoverable under the contract. See Part II(B), *infra* at 23-24.

[19] The same conclusion applies to VDOT's argument that AMEC failed to provide written notice under Specification § 105.16, which similarly required written notice "at the time of the occurrence *or* beginning of the work upon which the claim and subsequent action are based." (Emphasis added.)

- 17 -

consistent with our views of the contractual compensability of AMEC's claims. See Part II(B), *infra* at 18-28.

With respect to the remaining items contested on appeal (AMEC's claims for drilled shaft work; drilled shaft concrete specification; concrete formwork for foundation caps, piers, and columns; pier 17 foundation cap repair; and Work Orders 4, 6, 7, and 16),[20] we hold the court erred as a matter of law in concluding AMEC gave timely "written notice" of its "intention to file" a claim "at the time of the occurrence or beginning of the work upon which the claim and subsequent action is based." See Code § 33.1-386(A). The circuit court's contrary conclusion first dispensed with the statutory requirement of written notice and then held, in the alternative, that written notice had been given from "minutes" of meetings and "memoranda" exchanged between the parties. No legal precedent supports the court's first ruling, and no evidence supports its alternative ruling.

### B. VDOT'S CONTRACTUAL CHALLENGES TO SEVERAL OF AMEC'S CLAIMS

At trial, VDOT challenged AMEC's recovery of damages caused by elevated lake water levels, two winter periods, unanticipated boulders at the B640 bridge, interference from overhead power lines, and premium costs for a bond. No provisions of the contract, VDOT argued, provided any remedy for these claims.

▪ *Damages for Elevated Lake Water Levels*

Code § 33.1-387 authorizes a contractor to recover damages "under the contract." AMEC sought, and the circuit court awarded, damages caused by elevated lake water levels in

---

[20] At trial, VDOT either acknowledged or failed to contest AMEC's assertions that it provided timely, statutorily compliant, written notices of an intention to file claims related to elevated lake levels, the second winter period, boulders at bridge B640, and overhead power lines. VDOT has not made an issue of these claims on appeal.

the Kerr Reservoir. In support of this claim, AMEC relied on Specification § 104.03, entitled "Differing Site Conditions." This provision authorized additional compensation in two situations: first, when "subsurface or latent physical conditions" encountered during the work differ materially "from those indicated in the Contract" and, second, when "unknown physical conditions of an unusual nature" differ materially "from those ordinarily encountered and generally recognized as inherent in the work . . . ." Specification § 104.03.

Another provision of the contract, however, directly addressed the issue of fluctuating lake water levels. Under the heading "Site Information," the contract stated:

> The Contractor should be aware that due to the method of operating the John H. Kerr Reservoir and other factors beyond the control of the Department, the power pool elevation in the reservoir routinely fluctuates by several feet. These fluctuations can take place within a few days. It is the responsibility of the Contractor to avail himself of the historical records of the water levels maintained by the U.S. Army Corps of Engineers, Wilmington District and determine the impacts possible fluctuations may have on planned construction methods and operation. Information on past water levels is available through the Corp's website at http://www.saw.usace.army.mil while current and predicted water elevations can be obtained by contacting the John H. Kerr Powerhouse at (804) 738-6371 . . . .

Contract Order No. F77 at 142.[21] VDOT argued this provision precluded high lake water fluctuations from being deemed a differing site condition under Specification § 104.03.

We cannot discern from the record how the circuit court reconciled these two provisions. AMEC draws our attention to a remark from the bench on the last day of trial in which the court said the high water was a "major condition," making it "very difficult to believe that anyone could reasonably be expected to plan for a period of high water at the level this water was." The

---

[21] Specification § 103.06, entitled "Contract Documents," provided that the "Contract shall include the schedule of prices submitted by the bidder, plans, standard drawings, these specifications, supplemental specifications, special provisions, special provision copied notes, and the standard form of the Contract, all as furnished by the Department."

ostensible clarity of that remark, however, is clouded by another statement, only a moment or two earlier, in which the court acknowledged: "I'm not sure there were differing site conditions or not." And both comments were made in a soliloquy which began, "Let me give you a couple of observations because I'm still not totally pessimistic you can find a way to work this out."

However one interprets the court's remarks, we hold the contract defeats AMEC's high-water claim as a matter of law. Specification § 104.03 authorized a recovery of costs caused (i) by "subsurface or latent physical conditions" encountered during the work which differ materially "from those *indicated* in the *contract*," or (ii) by "*unknown* physical conditions of an unusual nature" which differ materially "from those ordinarily encountered and generally recognized as inherent in the work . . . ." (Emphasis added.) In the lexicon of government contract law, the first part of § 104.03 is known as a Type I condition and the second as a Type II condition. See generally Gerald I. Katz, Virginia General Conditions for Public Projects I-9 to I-10 (Virginia Law Foundation 1993); John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, Administration of Government Contracts 494-514 (4th ed. 2006) (reviewing parallel provision in federal government contracts).

Both aspects of Specification § 104.03 must then be placed within the context of the Site Information provision. This provision unmistakably informed AMEC that "factors beyond the control" of VDOT caused the lake water level to "routinely" fluctuate "by several feet." See Contract Order No. F77 at 142. Inherent in the representation that fluctuations by several feet were *routine* was the suggestion that *non-routine* fluctuations might be even higher. The Site Information provision warned AMEC to examine the U.S. Army Corps historical records (which included nearly 50 years of water elevation data) to "determine the impacts *possible* fluctuations may have on *planned* construction methods and operation." Id. (emphasis added).

- 20 -

When read alongside the Site Information provision, neither aspect of § 104.03 justifies the court's award. No Type I condition existed because the elevated lake water levels did not differ from any condition "indicated in the contract." See Specification § 104.03. Only an incongruence between a contract's representations and the realities of the worksite triggers a Type I condition under § 104.03. See, e.g., Asphalt Roads & Materials v. Commonwealth, 257 Va. 452, 454, 512 S.E.2d 804, 805 (1999) (finding Type I condition where "contract drawings" badly underestimated the specific amount of unusable soil to be removed by the contractor). The VDOT-AMEC contract established neither a baseline nor even a range of fluctuations. Instead, the contract advised AMEC that the water level of the lake "routinely fluctuates" by several feet and directed AMEC to review the historical records to take into account non-routine "possible fluctuations" of these levels. See Contract Order No. F77 at 142. Because lake water fluctuations were "beyond the control" of VDOT, id., the contract steered clear of making any binding representations on the subject.

No Type II condition existed either. "A Type II differing site condition is more rare than its Type I counterpart and is much more difficult to prove." 1 Richard F. Smith, Virginia Construction Law Deskbook ¶ 11.403, at 296 (2008); see also Cibinic, Nash & Nagel, *supra*, at 492 (recognizing the "relatively heavy burden of proof" required to prove a Type II condition). At best, AMEC's evidence proved only that for a period of time the lake water rose to an unusual level. Standing alone, however, that fact did not authorize contractual compensation. To recover damages, the contractor must prove "the condition was *unknown, unforeseeable* and *unusual*." Cibinic, Nash & Nagel, *supra*, at 509 (emphasis in original).

As Specification § 104.03 makes clear, only "*unknown* physical conditions" can constitute a Type II condition. Known conditions, whether of an unusual nature or not, must be

factored into the contractor's risk assessment.  See, e.g., Steven W. Feldman, Government Contract Guidebook § 28:8(b), at 797-98 (4th ed. 2008-09) (listing "[h]igh water level in a lake where work was to be performed" as a condition not included within the "Differing Site Conditions" provision); Cibinic, Nash & Nagle, *supra*, at 486-87 (listing "flooding" and "unusually high water" as outside the scope of the "Differing Site Conditions" clause).  Under the VDOT-AMEC contract, routine and non-routine water level fluctuations presented *known* conditional risks associated with the worksite — both categorically placed outside the scope of a Type II condition of Specification § 104.03.

In reply, AMEC argues VDOT conceded its contractual responsibility to compensate AMEC for delays attributable to high water by extending the contract completion date for this very reason.  Thus, "AMEC as a matter of logic became entitled to compensation for the delay." AMEC Appellee Br. at 23 (No. 2061-08-2).  We disagree.

VDOT issued work orders granting AMEC extra time to complete the work.  The extensions protected AMEC from *per diem* liquidated damages under Specification § 108.12 for failing to complete the work on time and also protected the contract from being terminated because of the delay.  But nothing in these extension work orders, or in the contract itself, necessarily provided AMEC with any contractual entitlement to recover damages during the periods of extension.[22]

As a general rule, "where the issue is excusable delay as opposed to compensable delay, the government accedes, because alternatives such as default termination are not feasible or

---

[22] VDOT made this point to AMEC at the time of the extensions.  Work Order 39 granted a 148-day extension with the caveat:  "This time extension shall in no way be construed to mean the Department will pay for any overhead cost associate[d] with the time extension."  Work Order 51 repeated this qualification:  "This time extension is not recognition by the Department of responsibility for any delays on the Project and shall in no way be construed to mean the Department will pay for any overhead cost associated with the time extension."

otherwise not in the government's best interests."  Feldman, *supra*, § 29.11, at 827.  Similarly, excusable delay provisions generally "protect a contractor only from a default termination or liquidated damages liability.  These clauses do not entitle the contractor to recover any additional performance costs."  Glen E. Monroe, Government Contract Law Manual § 2.92, at 52 (1979).  "Normally, if the delay was caused by events beyond the contractor's control, the contractor will be excused for the delay in performance (under the contract's "Default" clause) but is responsible for the additional costs caused by the delay."  Feldman, *supra*, § 16:1, at 488.  AMEC's view to the contrary, if it had the force of law, would badly disorient the management of government contracts.  A contracting agency would be loath to grant time extensions if the invariant consequence of doing so meant the agency thereby stipulated to inestimable damages and forfeited any right to contest the compensability of the contractor's claim.[23]

- *Claim for Damages During Two "Winter Periods"*

The contract initially required AMEC to complete the project by November 2003.  On several occasions, VDOT agreed to extend the deadline.  The extensions collectively spanned two additional winters.  In the circuit court, AMEC argued it had a contractual right to be compensated for damages during these two additional winter periods.

On appeal, VDOT claims the circuit court's general verdict included compensation for each day of both winter periods:  $1,938,418 for November 30, 2003, to April 1, 2004, and

---

[23] VDOT raises two additional points.  VDOT argues AMEC anticipated unusual water level fluctuations by instructing its subcontractor to "design the system" for constructing foundation caps so it would work if the water level increased to "15 feet above the soffit elevation" (about 307 feet), thus putting in place a "design parameter" belying AMEC's later allegation that high water levels constituted a differing site condition.  To make matters worse, VDOT adds, high water could not be viewed as a but-for cause in any event because AMEC's engineering manager admitted at trial that AMEC could only pour foundation caps "up to about 301" feet, a level well within the lake's routine fluctuations.  We offer no opinion on these assertions, preferring instead to rest our decision solely on the plain meaning of governing contractual provisions.

$1,922,530 for November 30, 2004, to April 1, 2005. AMEC disagrees, arguing that it "did not claim, nor was it awarded, damages for the *entirety* of *both* Winter Periods, as VDOT claims." AMEC Appellee Br. at 25 (No. 2061-08-2) (emphasis in original). AMEC asserts its evidence established that, "through AMEC's efforts, the 'Second Winter Period' did not ultimately affect AMEC's completion of the Project." Id. "Thus, to the extent AMEC overcame any delay event, including the 'Second Winter Period,' *AMEC did not seek compensation for that time*." Id. (emphasis in original).

The circuit court's general verdict did not segregate either or both of the additional winter periods from the aggregate damages awarded to AMEC. Because we reverse many of AMEC's claims the circuit court relied upon for its general verdict, we cannot determine how much, if any, of the damage award is attributable to either or both of the additional winter periods. We decline to offer what, in all likelihood, could be an advisory opinion.

Suffice it to say, even when a government contract authorizes recovery of damages for winter weather, the "contractor must demonstrate — through contemporaneous records if possible — the extent of the adverse weather and its impact on critical activities." Feldman, *supra*, § 29:7, at 821. We direct the circuit court on remand to review the evidentiary record and to make specific findings on whether AMEC proved any entitlement to damages for conditions during either or both of the two additional winter periods. If the court finds in AMEC's favor, the court should identify the contractual basis for the award and make factual findings as to the specific damages awarded.[24]

---

[24] On appeal, VDOT challenges the contractual compensability of AMEC's claims to both winter periods. Thus, it should not be assumed on remand that VDOT's challenge has been waived under law-of-the-case principles (as it should be with respect to AMEC's claim related to boulders at bridge B640, see n.25, *infra*).

▪ *Claim Related to Boulders at Bridge B640*

At trial, AMEC claimed it sustained damages due to drilled shaft problems and unanticipated boulders at the bridge B640 worksite. These conditions allegedly delayed work for 40 days. On appeal, VDOT does not challenge the compensability of the boulders claim. Instead, VDOT contends the evidence viewed in the light most favorable to AMEC proved no more than 8 days of delay attributable to boulders. The remainder, VDOT argues, belongs solely to delays attributable to the drilled shaft claim.

Here again, on this record, we cannot resolve this dispute on appeal given the inseverable nature of the circuit court's general verdict. Because we find many of AMEC's claims statutorily barred (including the drilled shaft claim), we remand the boulders claim to the circuit court with instructions to examine the evidentiary record and to make specific factual findings.[25] On remand, the circuit court should apply the maxim: "[W]here there is evidence of damage from several causes, for a portion of which a defendant cannot be held liable, a plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible." TechDyn Systems Corp. v. Whittaker Corp., 245 Va. 291, 296, 427 S.E.2d 334, 337 (1993) (citations omitted).

▪ *Claim for Interference from Overhead Power Lines*

The circuit court's general verdict included an award of damages AMEC sought as a result of having to wait for Dominion Virginia Power to deenergize overhead power lines near the worksite of pier 1 on bridge B641. AMEC claimed Specification § 105.07 inaccurately stated that "[e]xisting utilities" were indicated on the plans. The plans specifically noted the presence of the "footings for the power line post" near pier 1 on bridge B641 but not the lines

---

[25] As for the boulders issue, AMEC's entitlement to a recovery under the "Differing Site Conditions" clause became law of the case when VDOT did not challenge it on appeal.

strung between the power poles. After the contract was awarded, Dominion Virginia Power moved the power pole pedestal shown on the original plans to make way for AMEC to install the road leading to bridge B641.

In its pretrial motions and at trial, VDOT pointed out that AMEC failed to read the entirety of Specification § 105.07. Though § 105.07 anticipated that all utilities would be indicated on VDOT's plans (presumably the poles as well as the lines between them), the provision nonetheless placed the burden on AMEC to conduct its own pre-construction investigation to confirm the information in the plans:

> Prior to preparing a bid, the bidder shall contact known utility owners to determine the nature, extent, and location of existing, adjusted, or new utility facilities. Any additional cost resulting therefrom shall be reflected in the bid price for other items in the Contract.

Specification § 105.07. The contract further provided: "The new location of such utilities will *not* normally be shown on the plans. Some utilities may remain or be adjusted within the construction limits simultaneously with project construction operations." Id. (emphasis added). The specification required AMEC to "coordinate project construction with planned utility adjustments . . . ." Id.

As for any contractual right to damages, Specification § 105.07 expressly disclaimed VDOT's liability for damages caused by "interference" from electrical utility lines:

> Except as otherwise specified herein, the Department will not be responsible for any claims for additional compensation from the Contractor resulting from delays, inconvenience, or damage sustained by him attributable to interference by utility appurtenances, or the operation of moving the same, other than a consideration of an extension of time.
>
> If it is determined that interference by utility appurtenances caused a delay of such magnitude or otherwise altered project operations so as to increase significantly the Contractor's cost of performing the work,

the [VDOT] Engineer may consider additional compensation limited to the actual costs incurred by the Contractor. The determination of the severity of the interference, its impact on the Contractor's costs, and the amount, if any, of compensation shall be at the sole discretion of the Engineer. . . . Nothing herein shall be construed as requiring acceptance of the Contractor's presentation or payment of additional compensation.

In short, Specification § 105.07 noted that the plans should indicate the location of utility lines. AMEC does not deny the pre-construction plans depicted the location of the "power line pedestal" or claim the utility lines were not readily apparent from a site visit. At trial, AMEC claimed only that the lines themselves were not drawn in. Even assuming an insufficiency in the plans, Specification § 105.07 obligated the contractor to conduct its own investigation "to determine the nature, extent, and location" of the lines and to "coordinate project construction with planned utility adjustments." AMEC conceded that it made no effort to do so.

While VDOT reserved the "sole discretion" to provide the contractor either with an extension or compensation, Specification § 105.07 divested AMEC of any right to "additional compensation" beyond that which VDOT has approved. For these reasons, the circuit court erred in awarding any contractual damages under Specification § 105.07 for damages AMEC allegedly sustained due to the overhead power lines near pier 1 on bridge B641.

- ▪ *Claim for "Bond Premium"*

The circuit court awarded AMEC damages for a "bond premium."[26] On appeal, VDOT challenges the bond premium award as factually insupportable.[27] We have found no place in the record, however, where VDOT objected to the bond premium.

---

[26] Other than a line item on a spreadsheet exhibit summarizing AMEC's damages, no evidence in the record discloses what the bond was or what contractual right AMEC had to recover it as an element of damages. The circuit court made no mention of it from the bench or in its letter opinions. We infer the court awarded the bond premium line item, however, because the general verdict award necessarily included the amount. See Modified Summary of Damages (Tr. Exhibit P-103).

[27] Because VDOT does not raise the issue on appeal, we do not address whether the defaulted appellate challenge to the bond premium could be analogized to the situation in Little

Rule 5A:18 precludes appellants from raising for the first time on appeal "grounds asserted as a 'basis for reversal' of the trial court's judgment." Blackman v. Commonwealth, 45 Va. App. 633, 642, 613 S.E.2d 460, 465 (2005). Exceptions to Rule 5A:18 exist — but we employ them only in rare cases, and we never invoke them *sua sponte*. See Widdifield v. Commonwealth, 43 Va. App. 559, 564, 600 S.E.2d 159, 162 (2004) (*en banc*); Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*), aff'd by unpublished order, No. 040019 (Va. Oct. 15, 2004). Consequently, we will not review on appeal the factual or legal basis for the circuit court's award of a bond premium.

### C.   VDOT'S CHALLENGE TO THE TRIAL COURT'S DAMAGE AWARD

With respect to compensatory damages — both on undisputed claims and those surviving appeal — we must address VDOT's argument that AMEC's damage models were flawed on two different levels. VDOT asserts AMEC failed to present a *prima facie* case for its claim for extended, unabsorbed, home office overhead costs. VDOT also argues AMEC recovered impermissible mark-ups on its claims for reimbursement of actual costs for extra material, labor, and equipment.

- *Home Office Overhead Damages*

AMEC's expert included in his damage model a component for extended, unabsorbed, home office overhead. In a pretrial *in limine* motion and at trial, VDOT objected to AMEC's failure to present any evidence that it was unable to recoup home office overhead expenses by deploying its workforce on other revenue-producing aspects of the project. The court rejected VDOT's objection without comment.

---

v. Cooke, 274 Va. 697, 719, 652 S.E.2d 129, 142 (2007). In neither its appellate briefs nor oral argument did VDOT seek a remand of the bond premium award for recalculation based upon any success VDOT might have in obtaining the reversal of any of AMEC's other claims.

Overhead costs include expenses incurred by a contractor "for the benefit of its business as a whole." Fairfax County Redev. & Housing Auth. v. Worcester Bros., 257 Va. 382, 387-88, 514 S.E.2d 147, 150-51 (1999). The calculation includes, for example, "the salaries of office staff, accounting expenses, dues and subscriptions, equipment costs, and utility services." Id. When a project takes longer than the contractor estimated, the overhead expenses are "extended" for the period of delay. See generally Cibinic, Nash & Nagle, *supra*, at 720-26; Branca & Berry, *supra*, § 11:25, at 369. The overhead costs become "unabsorbed" when the contractor cannot perform other revenue-generating work to cover the lost income from the delayed work. See W. Noel Keyes, Government Contracts § 42.8, at 944-45 & nn.13 & 15 (3d ed. 2003). "When this occurs, the 'reduced activity' contract no longer 'absorbs' its share of overhead costs." Fairfax County Redev., 257 Va. at 388, 514 S.E.2d at 150 (citation omitted).

Not "every instance of delay," even if attributable to a contractual breach, entitles the contractor to a recovery of home office overhead costs. Id. at 388, 514 S.E.2d at 151. To prevail under Virginia law, the contractor must prove among other things "that it could not otherwise reasonably recoup its *pro rata* home office expenses incurred while its workforce was idled by the delay." Id. As a matter of law, the contractor cannot recover if it fails to "show that it was reasonably unable to recoup its overhead costs." Lockheed Info. Mgmt. Systems Co. v. Maximus, Inc., 259 Va. 92, 116, 524 S.E.2d 420, 433 (2000). It is not enough to show that the "government significantly interfered with efficient performance of the contract." Charles G. Williams Constr., Inc. v. White, 326 F.3d 1376, 1380 (Fed. Cir. 2003). In those circumstances, the contractor can still "allocate a portion of its indirect costs to that contract." Id. at 1381.

On appeal, VDOT contends AMEC failed to offer any evidence that it could not reasonably recoup its home office overhead costs from other revenue-producing work during the

periods of delay.[28]  We agree.  AMEC's expert described his calculation of home office

overhead in cursory terms.  His trial exhibit simply did the math:  first calculating the ratio of

project revenue to company revenue, applying that ratio to home office overhead, creating a *per*

*diem* rate from the resulting project attribution, and then multiplying the *per diem* rate by the

total days of delay.  These mathematical equations, however, relied wholly upon the unstated

(and thus unproven) assumption that AMEC could not have recouped its home office overhead

from other revenue-producing work.  Neither AMEC's expert nor any of its fact witnesses

addressed this point.

The inadequacy of AMEC's factual foundation parallels a similarly insufficient showing

rejected by Lockheed.  There, a contractor's expert allocated "company-wide overhead

expenses" to the breached contract and testified that the lost revenue from the contract caused the

allocated overhead to drive down the company's overall profits.  Lockheed, 259 Va. at 115, 524

S.E.2d at 433.  The expert did not specifically address (nor did any other evidence) whether other

revenue-producing work could have reasonably absorbed the overhead.  Lockheed held the

expert's testimony failed to establish a *prima facie* case for home office overhead damages:

> When a breach by a party causes a delay to the ability of the other
> party to perform, the injured party is entitled to recover, as
> damages, unabsorbed overhead expenses.  To recover such
> damages, the injured party must show that it could not otherwise
> recoup its *pro rata* home office expenses incurred during the delay
> and it must prove the amount of these expenses with reasonable
> certainty . . . .  [T]he plaintiff is required to show that it was
> reasonably unable to recoup its overhead costs.  *There is no such*
> *evidence in this case.*

---

[28] VDOT's argument on appeal goes further, contending that the evidence affirmatively disproved AMEC's entitlement for home office overhead by establishing that AMEC mobilized to other revenue-generating aspects of the project — thus producing earnings that fully or partially recouped any allegedly unabsorbed overhead.  See P.J. Dick, Inc. v. Principi, 324 F.3d 1364, 1373 (Fed. Cir. 2003) (affirming denial of overhead costs where the evidence "shows conclusively that [the contractor] was able to progress other parts of the work during the time periods it alleges it was suspended").  Our holding makes it unnecessary to decide whether the evidence *disentitled* AMEC to a recovery of home office overhead.

Id. at 115-16, 524 S.E.2d at 433 (second emphasis added). The same can be said here as well.

AMEC's evidence failed to address its "ability or inability to reasonably recoup," id. at 116, 524

S.E.2d at 433, overhead expenses from other revenues. The circuit court, therefore, erred in

finding AMEC's evidence sufficient to support an award of home office overhead.[29]

   ▪ *Actual Costs vs. § 109.05 Mark-Ups*

Prior to trial, VDOT filed a motion *in limine* objecting to AMEC's expected expert

testimony on damages. AMEC's expert, VDOT argued, improperly calculated damages by

employing cost mark-ups under Specification § 109.05. These mark-ups included, among other

things, enhancements for "administration and profit." The circuit court denied the motion

without prejudice reserving all such issues for resolution at trial.

At trial, AMEC's expert admitted his damage model used mark-ups allowed under

Specification § 109.05. That provision authorized compensation for "[e]xtra work" on a "force

account basis." AMEC used this method in its administrative claim and expressly applied

"applicable mark ups" to base labor and equipment costs. See AMEC Administrative Claim at

22. A 10% mark-up was applied to AMEC's subcontractor costs under § 109.05(f) and a 15%

mark-up to AMEC's rented equipment costs under § 109.05(d). The materials costs included a

15% mark-up to cover "administration and profit" under § 109.05(c). AMEC added to its labor

costs a 70% mark-up under § 109.05(a)-(b).

VDOT renewed its objection at trial to this testimony and contested any damage award

based upon it. VDOT argued § 109.05's "force account" pricing formula applied not to

contractual damages generally but only to "[e]xtra work" pursuant to work orders issued by

VDOT during the project. AMEC's claims for contractual damages did not seek recovery for

force-account work orders.

---

[29] VDOT does not argue AMEC similarly failed to prove its worksite overhead expenses were unabsorbed. We express no opinion on the matter. See generally Feldman, *supra*, § 29:6, at 817-18.

The circuit court rejected VDOT's arguments without comment. The court's general verdict adopted in full the damage figures advocated by AMEC's expert. On appeal, AMEC defends the circuit court's award arguing that "Specification § 109.05 prescribes the method of calculation." AMEC Appellee Br. at 18 (No. 2061-08-2).

As we have already explained, AMEC failed to present a *prima facie* case for the recovery of home office overhead. To the extent § 109.05's force-account pricing formula included a recovery of home office overhead, the circuit court erred by awarding such damages.

We reach the same conclusion with respect to profit margins included within the mark-ups allowed by § 109.05. Because AMEC's claims did not (and could not) seek recovery on a force-account basis, § 109.05 has no relevance.[30] Instead, AMEC's claims stemmed either from the Differing Site Conditions provision, § 104.03, which expressly excluded "anticipated profits," or from the general dispute provision, § 105.16, which twice stated, "Only *actual costs* for materials, labor, and equipment will be considered." (Emphasis added.)[31]

To the extent it relied on § 109.05's allowance of profit margin mark-ups, AMEC's damage model was systemically flawed. An award of actual costs includes direct costs (like the price of materials and the wages of employees) and indirect costs (like home office overhead). See Fairfax County Redev., 257 Va. at 388, 514 S.E.2d at 151. Actual costs exclude profit margin mark-ups, which by definition go beyond direct and indirect expenditures. Cf. William

---

[30] As AMEC correctly notes, Specification § 109.05 provided: "Extra work performed in accordance with the requirements of Section 104.03 will be paid for at the unit prices or lump sum specified in the work order." Under § 101.02, however, "[e]xtra work" means an "item of work that is not provided for in the Contract as awarded but that is found to be essential to the satisfactory fulfillment of the Contract within its intended scope." Extra work thus does not include completing, albeit under more arduous or costly conditions, an "item of work" already required by the contract.

[31] The applicability, if any, of Code § 2.2-4335 to any aspect of AMEC's delay damage claims has not been addressed by AMEC or VDOT either in the circuit court or on appeal. We thus offer no opinion on this subject. Cf. Martin Bros. Contractors v. Va. Military Inst., 277 Va. 586, 675 S.E.2d 183 (2009).

Schwartzkopf & John J. McNamara, Calculating Construction Damages § 8.03, at 171 (2d ed. 2001) ("Generally, profit may not be recovered when a contractor is simply delayed in the performance of its work.").

On remand, the circuit court should reexamine the evidentiary record to determine whether the evidence provides a reasonable basis to determine actual costs incurred by AMEC as a result of the claims unaffected by this appeal.[32] The recalculated damage award should exclude any recovery for mark-ups attributable to home office overhead and profit margins.

### D. AMEC'S REQUEST FOR PREJUDGMENT INTEREST

The circuit court denied AMEC's request for prejudgment interest on its award of compensatory damages. On appeal, AMEC asserts the court erred in doing so. We disagree.

"Interest may be awarded against a sovereign only by its consent." Bd. of Supervisors v. FCS Bldg. Ass'n, 254 Va. 464, 466, 492 S.E.2d 634, 636 (1997) (citing Ry. Express Agency Inc. v. Commonwealth, 196 Va. 1059, 1066, 87 S.E.2d 183, 187 (1955)). In Virginia, "so far as we know, it has never been held by this court that a claim asserted against the State . . . bears interest where there is no provision in the statute or authorized agreement creating the liability for the payment of interest." County of Fairfax v. Century Concrete Servs., 254 Va. 423, 425, 492 S.E.2d 648, 650 (1997) (quoting City of Lynchburg v. Amherst County, 115 Va. 600, 608, 80 S.E. 117, 120 (1913)); see Commonwealth v. Safe Deposit & Trust Co., 155 Va. 458, 460, 155

---

[32] VDOT also challenges any use of the "Rental Rate Blue Book" for purposes of estimating actual costs associated with owner-furnished equipment. AMEC's expert, however, testified that he used the Blue Book to approximate "actual costs" for owner furnished equipment. Based on this testimony, the circuit court accepted the Blue Book as "a standard used in the profession" for estimating these costs. *On this record*, we cannot say the court was plainly wrong. Therefore, once purged of home office overhead and profit margins, if any, the estimates in the "Rental Rate Blue Book" may be relied upon by the circuit court as a basis for determining owner-furnished equipment costs on remand. See generally Schwartzkopf & McNamara, *supra*, § 3.04[C], at 88-89.

S.E.2d 897, 898 (1930) (noting that "interest, when not stipulated for by contract, or authorized by statute, . . . is not to be awarded against a sovereign government").[33]

"Under Virginia law, courts must strictly construe contractual — as well as statutory — waivers of immunity." George Hyman Constr. Co. v. Washington Metro. Area Transit Auth., 816 F.2d 753, 760 (D.C. Cir. 1987) (rejecting, on sovereign immunity grounds, a claim for prejudgment interest arising out of a government contract). Our courts have long held "there can be no waiver of sovereign immunity by implication." Hinchey v. Ogden, 226 Va. 234, 241, 307 S.E.2d 891, 895 (1983). The General Assembly "may limit the right to sue to certain specified causes" and, when it does so, the Commonwealth "can be sued only in the manner and upon the terms and conditions prescribed." Va. Bd. of Med. v. Va. Physical Therapy Ass'n, 13 Va. App. 458, 465, 413 S.E.2d 59, 63 (1991) (citation omitted).

No express statutory waiver of sovereign immunity exists for AMEC's claim for prejudgment interest. Code § 33.1-387 authorizes AMEC's civil action only on the "portion" of the administrative claim denied by VDOT. Code § 33.1-386(A) authorizes an administrative claim, but limits it to a recovery of "costs and expenses" under the contract. Code § 33.1-386(A) says nothing about an allowance of prejudgment interest on contractually recoverable costs and expenses. The general prejudgment interest statute, Code § 8.01-382, does not expressly or by necessary implication apply to the Commonwealth. To be sure, the statutory predecessors to Code § 8.01-382 (Code of 1904, §§ 3390-91) existed when the Virginia Supreme Court said our courts "aided by the legislature" have authorized prejudgment claims, but that no court has

---

[33] Safe Deposit Co. quoted this *dictum* from a Wisconsin case that has since been overruled. See City of Milwaukee v. Firemen's Relief Ass'n, 165 N.W.2d 384, 390 (Wis. 1969), overruling Schlesinger v. State, 218 N.W. 440 (Wis. 1928). The *dictum*, however, continues to have considerable support from modern precedents. See, e.g., Kingston Constructors v. Washington Metro. Area Transit Auth., 860 F. Supp. 886, 888 (D.D.C. 1994) ("It is well-settled that a sovereign is immune from liability for interest unless it has waived its immunity by statute or contract.").

authorized such claims "against the State" itself. City of Lynchburg, 115 Va. at 608, 80 S.E. at 120.

Nothing in the contract authorized a recovery of prejudgment interest on a successful administrative claim. The contract limited payment of interest to situations involving an untimely "final payment" under § 109.09 or a "partial payment" invested with an escrow agent under § 109.07. These payments, however, involve agreed-upon contractual payments — not contested sums asserted in the administrative claim process. The provision governing disputed administrative claims, § 105.16, did not authorize interest on disputed claims. Even when VDOT and the contractor enter into a settlement agreement resolving a disputed administrative claim, the payment of the settlement funds itself "will not be subject to payment of interest unless such payment is specified as a condition of the claim settlement." Specification § 105.16.

III.

In sum, we reverse in part and affirm in part the circuit court's final order.

A. *Statutory Written Notice Requirements*.

Code § 33.1-386(A) bars part of AMEC's acceleration claim and five of the other six claims challenged by VDOT on appeal as violative of the statutory requirement of a timely, written notice of the contractor's intention to file an administrative claim. We direct the circuit court on remand to recalculate its award to exclude these barred claims.[34]

B. *Contractual Compensabilty of Several of AMEC's Claims*.

The circuit court erred in awarding damages for AMEC's claims related to elevated lake water levels and interference from overhead power lines.

---

[34] The barred claims involve the disputes concerning drilled shaft work; acceleration efforts prior to April 2004 and acceleration efforts after April 2004 unrelated to the alleged inadequacies of Work Order 39; drilled shaft concrete specification; concrete formwork for foundation caps, piers, and columns; pier 17 foundation cap repair; and Work Orders 4, 6, 7, and 16. We hold neither Code § 33.1-386(A) nor the notice provisions of the contract bar the claim for the first winter period.

With respect to AMEC's claim related to the two winter periods, we direct the circuit court on remand to review the evidentiary record and to make specific findings on whether AMEC proved any entitlement to damages for conditions during either or both of the two additional winter periods. If the court finds in AMEC's favor, the court should identify the contractual basis for the award and make factual findings as to any specific damages awarded.

With respect to AMEC's claim of damages caused by boulders at bridge B640, we direct the circuit court on remand to review the evidentiary record and to make specific findings on whether AMEC proved damages specifically attributable to this condition.

Applying Rule 5A:18, we affirm the circuit court's award of damages associated with AMEC's bond premium.

C. *Calculation of AMEC's Damages*.

The circuit court erred in granting AMEC an award for home office overhead and by allowing AMEC to mark up its actual costs with either home office overhead or profit margins. We direct the court on remand to excise such mark-ups from any damage award attributable to claims surviving this appeal.

D. *Prejudgment Interest*.

We affirm the circuit court's denial of AMEC's request for an award for prejudgment interest. VDOT raises no challenge on appeal to any award of post-judgment interest, and thus, we do not address this issue.

> Reversed in part, affirmed in part,
> and remanded for further proceedings
> consistent with this opinion.