**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-1143**

_____

CARNELL CONSTRUCTION CORPORATION,

           Plaintiff - Appellant,

      v.

DANVILLE REDEVELOPMENT & HOUSING AUTHORITY; BLAINE SQUARE, LLC,

           Defendants - Appellees.

_____

**No. 13-1229**

_____

CARNELL CONSTRUCTION CORPORATION

           Plaintiff – Appellee,

      v.

DANVILLE REDEVELOPMENT & HOUSING AUTHORITY

           Defendant – Appellant,

      and

BLAINE SQUARE, LLC

           Defendant.

_____

**No. 13-1239**

_____

CARNELL CONSTRUCTION CORPORATION

           Plaintiff – Appellee,

v.

BLAINE SQUARE, LLC

        Defendant – Appellant,

    and

DANVILLE REDEVELOPMENT & HOUSING AUTHORITY

        Defendant.

---

Appeal from the United States District Court for the Western District of Virginia, at Danville.  Glen E. Conrad, Chief District Judge.  (4:10-cv-00007-GEC)

---

Argued:  December 11, 2013        Decided:  March 6, 2014

---

Before AGEE, KEENAN, and FLOYD, Circuit Judges.

---

Affirmed in part, vacated in part and remanded, vacated in part and final judgment by published opinion.  Judge Keenan wrote the opinion, in which Judge Agee joined.  Judge Floyd wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED**: Rhonda M. Harmon, THE HARMON FIRM LLC, Manakin-Sabot, Virginia, for Appellant/Cross-Appellee.  John Dickens Eure, JOHNSON, AYERS & MATTHEWS, PLC, Roanoke, Virginia;  Joseph Ray Pope, WILLIAMS MULLEN, Richmond, Virginia, for Appellees/Cross-Appellants.  **ON BRIEF**: Lori J. Bentley, Joshua D. Goad, JOHNSON, AYERS & MATTHEWS, PLC, Roanoke, Virginia, for Blaine Square, LLC.  J. Nelson Wilkinson, James V. Meath, WILLIAMS MULLEN, Richmond, Virginia, for Danville Redevelopment & Housing Authority.

---

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, we review a judgment entered after a jury trial on certain claims of race discrimination, retaliation, and breach of contract brought by a "minority-owned" corporation. We primarily consider: (1) whether a minority-owned corporation has standing to sue for race discrimination under Title VI of the Civil Rights Act of 1964 (Title VI); (2) whether the district court erred in holding at the summary judgment stage that one of the defendants could not be held liable on the alleged race discrimination and retaliation (collectively, race discrimination) claims; (3) whether the court abused its discretion by permitting the use of certain impeachment evidence at trial; (4) whether the court erred in deciding certain contract issues arising under the Virginia Public Procurement Act, Virginia Code §§ 2.2-4300 through 4377; and (5) whether the court erred in modifying the jury's award of contract damages.

Upon our review, we hold that a corporation can acquire a racial identity and establish standing to seek a remedy for alleged race discrimination under Title VI, but that the district court properly dismissed one of the defendants from liability on the plaintiff's race discrimination claims. We further conclude that the district court abused its discretion in permitting the use of particular impeachment evidence, which should have been excluded as unfairly prejudicial under Federal

3

Rule of Evidence 403. Finally, we agree that the district court properly reduced certain damages awarded to the plaintiff on its contract claims, but decide that the strict notice requirements of the Virginia Public Procurement Act required the court to narrow further the scope of recoverable contract damages. Accordingly, we affirm the district court's judgment in part. We also vacate the court's judgment on both the race discrimination claims and certain contract damages awarded, and remand those aspects of the case for further proceedings.

I.

A.

This appeal involves work performed by a contractor in Danville, Virginia, on the Blaine Square Project (the project), a large public housing venture intended to provide subsidized rental units to low-income residents of Danville. The project was funded in part by a $20 million grant to the Danville Redevelopment and Housing Authority (the Housing Authority) from the Hope VI Program, an initiative of the United States Department of Housing and Urban Development (HUD), which allows private investors to contribute capital to public housing projects in exchange for tax credits.

In March 2008, the Housing Authority solicited bids for site preparation work (site preparation work, or the work),

4

which included clearing the construction site for the project, grading the land, and installing proper drainage and erosion controls. Carnell Construction Corporation (Carnell) submitted a bid for the work, proposing a price of $793,541 and representing that Carnell was certified as a minority business enterprise because its owner is African-American.

After determining that Carnell was the lowest bidder, the Housing Authority entered into a contract with Carnell to complete the site preparation work (the contract). The contract specified a June 2009 completion date, stipulated a total price of $793,541, and included a set of enumerated contract documents.

Shortly after executing the contract with Carnell, the Housing Authority leased the project site and assigned its interest in the contract to Blaine Square, LLC (Blaine) based on tax considerations. Blaine is a limited liability company managed by a non-profit instrumentality of the Housing Authority. Blaine was created to obtain and distribute tax credits to private investors. The Housing Authority agreed to provide funds from the Hope VI Program to Blaine and, under a Development Services Agreement (DSA), Blaine agreed that the Housing Authority would continue to provide actual supervision of the construction, including the site preparation work.

Carnell began the work on the project in June 2008. However, the relationship between Carnell and the Housing Authority steadily deteriorated as each party became dissatisfied with the other's performance. The Housing Authority attributed expensive delays to Carnell's allegedly unacceptable work, particularly regarding the grading of the project site and Carnell's failure to conduct due diligence concerning the contract's requirements. Carnell, however, maintained that its work was satisfactory and that delays chiefly were attributable to poor planning by the Housing Authority, especially with respect to a strategy for completing grading work and controlling erosion at the project site.

Additionally, in December 2008, Carnell's president, Michael Scales, complained about race discrimination to the Housing Authority's Executive Director, Gary Wasson. Scales explained his perception that Carnell was "being singled out as a minority contractor," and was "expected . . . to work for free" on "excessive" project modifications. At Carnell's request, the parties attempted to mediate their grievances, but were unsuccessful in their efforts.

In May 2009, the Housing Authority advised Carnell that it would not extend Carnell's contract beyond the stipulated completion date, and that Carnell would be required to remove its equipment and personnel from the project site the following

month regardless whether the work had been completed. Carnell left the project site more than two weeks before the June 2009 completion date, and requested reimbursement for numerous instances of unpaid work. The Housing Authority rejected Carnell's request and declared a default under Carnell's performance bond.

Carnell filed a lawsuit against the Housing Authority and Blaine (the defendants) based on claims of race discrimination and breach of contract.[1] The race discrimination claims were based on the defendants' alleged violations of Title VI and 42 U.S.C. § 1981. As ultimately developed in the litigation, Carnell's race discrimination claims centered on certain statements made by the Housing Authority's Hope VI Program Director and Contracting Officer, Cedric Ulbing, as well as alleged disparate treatment with respect to contracting practices such as "prepayment" for materials, "retainage" of progress payments, and approval of change order requests. Carnell's contract claims focused on allegations that Carnell was directed to perform work for which it was never paid, and

---

[1] Carnell's original and first amended complaints named only the Housing Authority as a defendant. A second amended complaint listed Blaine as a defendant, but only with respect to Carnell's breach of contract claims. After the first jury trial in this case, Carnell filed a third amended complaint alleging race discrimination and breach of contract claims against both the Housing Authority and Blaine.

that Carnell improperly was removed from the project and declared in default of its contract obligations. The Housing Authority and Blaine filed a counterclaim for breach of contract and, at trial, framed Carnell's lawsuit as an example of "occasions when false claims of race discrimination are made in order to cover up poor performance, [to] excuse poor performance, or to gain an advantage in a contractual situation."

After a two-week trial, a jury awarded Carnell more than $3.1 million in damages on the race discrimination claims. The jury found in favor of both Carnell and the defendants on their respective breach of contract claims, but did not award damages on any of the contract claims. However, based on a post-trial ruling that certain testimony admitted on behalf of Carnell was false, the district court ordered a new trial.[2]

Before the second trial began, the district court awarded summary judgment to Blaine on Carnell's race discrimination claims, holding that Blaine could not be held liable for the allegedly discriminatory conduct because there was no evidence that Blaine directly participated in the conduct alleged or controlled the activities of a discriminating party. Following

---

[2] Carnell does not argue on appeal that the district court erred in vacating the jury award in the first trial and in ordering a new trial.

the trial, after the jury was unable to agree on a verdict on either the remaining race discrimination claims or the contract claims, the district court declared a mistrial and scheduled the case for a third trial.

A recurring issue in the litigation that resurfaced during the third trial involved certain impeachment evidence regarding the fact that Scales had hired McGuireWoods Consulting LLC (McGuireWoods) to "assist Carnell in reputation management and media outreach" with respect to Carnell's race discrimination claims against the Housing Authority. The controversy centered on an unsigned McGuireWoods document entitled "Assessment and Proposal" (the proposal, or the McGuireWoods proposal), which set forth goals to "[s]hape the initial story so that it is sympathetic to Carnell and critical of [the Housing Authority]" and to "[e]xpand on the initial story in Danville to garner broader interest in the case in neighboring counties, and potentially statewide interest . . . ." Carnell repeatedly objected to use of this evidence on the grounds that it was irrelevant and unfairly prejudicial.

During cross-examination of Scales in the third trial, counsel for the Housing Authority asked whether Scales had "worked to shape and tone the content of this evidence" to "make out a race claim" to the jury. Scales denied these suggestions, and stated that he had hired McGuireWoods "to tell who we are."

After much discussion, and over Carnell's repeated objections that the proposed impeachment evidence was unfairly prejudicial and irrelevant, the district court allowed counsel for the Housing Authority to recite the language from the proposal quoted above, in an attempt to impeach Scales with the allegedly inconsistent statements. However, Scales testified that he was unfamiliar with the unsigned document and only recalled reviewing a two-page consulting agreement in which he agreed to hire McGuireWoods on Carnell's behalf. Nevertheless, during closing argument, counsel for the Housing Authority displayed the challenged language from the proposal on a poster board that was shown to the jury, and referred to that language multiple times in the context of impugning Scales's credibility and the motives underlying Carnell's lawsuit.

Ultimately, Carnell did not prevail at the third trial on its race discrimination claims. However, the jury found in favor of Carnell both on its breach of contract claims and on the Housing Authority's counterclaim for breach of contract. The jury awarded Carnell a total of $915,000 on its contract claims, allocating $515,000 for the defendants' failure to pay Carnell for extra work and $400,000 for the defendants' removal of Carnell from the project without just cause. The district court later issued a post-trial ruling that significantly limited the jury's award of contract damages to a reduced total

10

of about $215,000, based on the court's determination that Carnell had failed to plead special contract damages, and that the Virginia Public Procurement Act, Virginia Code §§ 2.2-4300 through 4377, restricted the amount by which the parties' fixed-price, public contract lawfully could be increased.[3] The parties timely filed cross-appeals.

## II.

We first address several issues related to Carnell's race discrimination claims. Those issues concern: (1) whether Carnell, as a corporate entity, had standing to assert race discrimination claims under Title VI; (2) whether the district court properly dismissed Blaine at the summary judgment stage from liability for the allegedly discriminatory conduct; and (3) whether the district court abused its discretion in allowing certain impeachment of Scales based on the contents of the McGuireWoods proposal.

### A.

_____

[3] This amount reflects a reduced award that includes $142,557.57 for contract claims relating to unpaid work, after the district court implemented the Virginia Public Procurement Act's statutory cap, and $72,490.00 for contract claims relating to removal from the project without just cause, based on the court's determination that Carnell failed to prove the full extent of the general damages that it was awarded on those claims. On appeal, Carnell does not challenge the court's reduction of general damages on its unjust removal claims.

We begin by considering whether Carnell, as a corporate entity, had standing to assert claims of race discrimination and retaliation under Title VI. We review this question of law de novo. Frank Krasner Enters., Ltd. v. Montgomery Cnty., 401 F.3d 230, 234 (4th Cir. 2005).

The standing doctrine, which requires us to consider whether a plaintiff is entitled to a decision on the merits of a dispute, has both constitutional and prudential dimensions. Allen v. Wright, 468 U.S. 737, 751 (1984). The defendants do not dispute that Carnell meets the constitutional test of standing, namely, that Carnell has alleged that (1) it has suffered an actual or threatened injury that is concrete, particularized, and not conjectural; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006).

Instead, the defendants assert that Carnell's Title VI claims run afoul of one of the standing doctrine's judicially imposed, prudential limits on federal jurisdiction, which requires that "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit." Bennett v. Spear, 520 U.S. 154, 162 (1997). Thus, the relevant standing inquiry

12

before us is whether Carnell's claims arguably fall within the zone of interests protected by Title VI.  See id.

Carnell's race discrimination claims are based on 42 U.S.C. § 2000d, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  The defendants argue that Carnell lacks standing to bring race discrimination claims under Title VI because Carnell is not a "person" within the meaning of the statute.  The defendants maintain that Carnell, a corporate entity, lacks a "race, color, or national origin." See id.  In support of their position, the defendants primarily rely on dictum from the Supreme Court's decision in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 263 (1977) (Arlington Heights), in which the Court stated that a corporation "has no racial identity and cannot be the direct target" of race discrimination.

Our Circuit has not addressed this standing issue in any published opinion.  However, we observe that several other federal appellate courts have considered this question, and have declined to bar on prudential grounds race discrimination claims brought by minority-owned corporations that meet constitutional standing requirements.  Cf. Domino's Pizza, Inc. v. McDonald,

13

546 U.S. 470, 473 n.1 (2006) (recognizing that "the Courts of Appeals to have considered the issue have concluded that corporations may raise [42 U.S.C.] § 1981 claims" for injuries due to race discrimination) (citation omitted). Indeed, in various statutory contexts, several of our sister circuits have concluded that corporations have standing to assert race discrimination claims, including claims brought under Title VI. See, e.g., Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1060 (9th Cir. 2004) (Section 1981 claim); Oti Kaga, Inc. v. S.D. Hous. Dev. Auth., 342 F.3d 871, 882 (8th Cir. 2003) (Fair Housing Act claims); Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc., 295 F.3d 1065, 1072 (10th Cir. 2002) (Sections 1981 and 1982 claims); Gersman v. Group Health Ass'n, 931 F.2d 1565, 1568 (D.C. Cir. 1991) (Section 1981 claim), vacated on other grounds, 502 U.S. 1068 (1992); Triad Assocs., Inc. v. Chi. Hous. Auth., 892 F.2d 583, 591 (7th Cir. 1989) (Section 1983 claim), abrogated on other grounds, Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668 (1996); Hudson Valley Freedom Theater, Inc. v. Heimbach, 671 F.2d 702, 706 (2d Cir. 1982) (Title VI claim); Des Vergnes v. Seekonk Water Dist., 601 F.2d 9, 13-14 (1st Cir. 1979) (Section 1981 claim).[4]

---

[4] We further observe that the plain language of the statute may allow a corporation to have Title VI standing. Title VI does not specifically define "person," but the Dictionary Act (Continued)

14

Notably, in the context of a plaintiff asserting a claim under Title VI, the Second Circuit observed that it is

> hard to believe that the Supreme Court would deny standing to the corporation because it "has no racial identity and cannot be the direct target" of the discrimination, while at the same time it would be obliged to deny standing to the stockholders on the sound ground that the injury was suffered by the corporation and not by them.

Hudson Valley, 671 F.2d at 706 (quoting Arlington Heights, 429 U.S. at 263). The Second Circuit thus held that when a corporation satisfies constitutional requirements for standing, prudential considerations should not prohibit that corporation from alleging that a defendant, on racial grounds, has acted to obstruct purposes that the corporation was created to accomplish. Id.

We are persuaded by the Second Circuit's reasoning, and conclude that the dictum in Arlington Heights does not impede our application of the Second Circuit's analysis. In Arlington Heights, the Supreme Court was not required to consider whether

---

does: "In determining the meaning of any Act of Congress, unless the context indicates otherwise," the word person "include[s] corporations." 1 U.S.C. § 1. Moreover, § 2000d prohibits a "person" from being discriminated against "on the ground of race, color, or national origin," not "on the ground of his or her race, color, or national origin." See Hudson Valley, 671 F.2d at 705 (observing the same); see also Mohamad v. Palestinian Auth., 132 S. Ct. 1702, 1707-08 (2012) (observing that Congress often uses the word "individual" to mean something different from its use of the word "person").

15

a corporation had standing to assert that it suffered injury based on racial discrimination in violation of federal law, because one of the other plaintiffs in the case was an African-American individual who plainly had demonstrated standing to bring the action.[5] 429 U.S. at 263. Thus, the quoted language from Arlington Heights was surplusage unrelated to the Court's determination of the standing issue presented.

We agree with the Ninth Circuit that a minority-owned corporation may establish an "imputed racial identity" for purposes of demonstrating standing to bring a claim of race discrimination under federal law. Thinket Ink, 368 F.3d at 1059. We hold that a corporation that is minority-owned and has been properly certified as such under applicable law can be the direct object of discriminatory action and establish standing to bring an action based on such discrimination. Accordingly, we agree with the conclusions reached by our sister circuits that

---

[5] In Arlington Heights, a non-profit real estate developer agreed to purchase land in order to build racially-integrated housing for residents with low and moderate incomes. 429 U.S. at 255-56. When local authorities withheld the necessary clearance to rezone the land from a single-family to a multiple-family housing classification, the developer and several African-American individuals filed a lawsuit alleging that their refusal to change the classification of the land was racially discriminatory. Id. at 258-59. The Supreme Court ultimately held that the developer and an individual plaintiff had standing to bring the action, but failed to carry their burden of proving that discriminatory intent was a motivating factor in the rezoning decision. Id. at 263-64, 270.

16

prudential considerations should not bar review of a claim of race discrimination suffered by such a corporation during its participation in a program that has received federal funding assistance.

Examining the present record, we conclude that Carnell has standing to bring its race discrimination claims under Title VI. It is undisputed that Carnell properly was certified by the Commonwealth of Virginia as a "Small, Women- and Minority-Owned Business" because its president and sole shareholder is African-American. Carnell publicly represented that it was eligible for consideration as a minority business enterprise when it contracted to work for the Housing Authority on a public project receiving federal funding assistance. Carnell alleged that the defendants discriminated against Carnell during its performance on the contract based on the minority status of its owner, and that Carnell suffered direct injury as a result of that racial discrimination. Therefore, we hold that under the facts before us, Carnell sufficiently has shown an imputed racial identity permitting us to conclude that Carnell's corporate status does not prevent its race discrimination claims from falling within the zone of interests protected by Title VI. See Bennett, 520 U.S. at 162.

Our conclusion is not altered by the defendants' alternative contention that Carnell lacked standing because it

was not an intended beneficiary of Hope VI Program funding. Title VI does not require that an injured party be the intended beneficiary of federal funds. Instead, Title VI provides that no person shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race. 42 U.S.C. § 2000d. Thus, the determinative inquiry in this regard is whether Carnell alleged that it suffered injury based on race discrimination and was either participating or seeking to participate in a federally funded activity, or was the intended beneficiary of those federal funds. Cf. Guardians Ass'n v. Civil Serv. Comm'n of N.Y., 463 U.S. 582, 633 (1983) ("Because Title VI is intended to ensure that 'no person' is subject to discrimination in federally assisted programs, private parties function as third-party beneficiaries to these contracts."); United States v. Harris Methodist Fort Worth, 970 F.2d 94, 97 (5th Cir. 1992) (concluding that Title VI protects physician staff in hospitals that receive federal funding); Soberal-Perez v. Heckler, 717 F.2d 36, 38 (2d Cir. 1983) (interpreting Title VI to cover "situations where federal funding is given to a non-federal entity which, in turn, provides financial assistance to the ultimate beneficiary").

18

Carnell plainly has met this test.  It is undisputed that Carnell submitted a successful bid proposal, entered into a federally funded contract with the Housing Authority, and performed services under that contract for nearly a year. Carnell therefore undoubtedly has participated in the Hope VI Program, "a program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Accordingly, we hold that Carnell's Title VI claim meets the requirements for prudential standing, and we proceed to consider the merits of Carnell's appeal.

B.

Carnell argues that the district court erred in awarding summary judgment to Blaine on Carnell's race discrimination claims.  The district court held that there was no evidence that Blaine engaged in the alleged discriminatory conduct during construction of the Project, either by participating directly in that conduct or by controlling the conduct of Housing Authority representatives under an agency relationship with the Housing Authority.

Carnell contests both these findings on appeal.  We review the district court's award of summary judgment de novo, and consider the evidence and all inferences fairly drawn from the evidence in the light most favorable to Carnell.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-

19

88 (1986); Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1127 (4th Cir. 1987).

We first address the district court's determination that the record lacked evidence supporting a claim that Blaine participated directly in the allegedly discriminatory behavior. According to Carnell, the district court's conclusion was erroneous because Blaine "solely . . . controlled" the financing for the project and directed that various contested payments be withheld from Carnell.

Carnell's argument, however, misrepresents the record before us. The deposition testimony of Blaine's corporate designee, Owen McCormick, plainly states that Blaine "did not do anything directly in furtherance of its obligations under the contract," but was "a passive entity [that] would ensure that the checks would be written to [the Housing Authority] for purposes of paying the contractors." Written correspondence in the record corroborated that the allegedly discriminatory denials of Carnell's requests for certain payments were made by Housing Authority personnel, not by Blaine.

Additionally, as the district court observed, Blaine is a limited liability company with "no individual officers or employees" acting on its behalf. According to the relevant version of Blaine's "Operating Agreement," Blaine's three shareholders are corporate entities, including an investor

20

member, a special member, and the managing member, which is a non-profit company led by Housing Authority Executive Director Gary Wasson. Moreover, the record fails to establish that Gary Wasson acted in any respect on Blaine's behalf when he engaged in allegedly discriminatory acts against Carnell.[6]

Carnell argues, nevertheless, that Blaine was vicariously liable for the discriminatory conduct of Housing Authority representatives. Carnell asserts that the DSA designated Blaine as the "Owner" of the project with full control over the Housing Authority, which merely was an agent obligated to assist Blaine in performing Blaine's contractual obligations. We disagree with Carnell's position.

Both parties agree that Virginia law governs the relationship between Blaine and the Housing Authority under the DSA. Under Virginia law, control is a necessary component of a principal-agent relationship. Cf. Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P., 560 S.E.2d 246, 249 (Va. 2002) (defining agency as "a fiduciary relationship" based on the

---

[6] Carnell argues that Wasson was listed as Blaine's "President" on two documents he signed on Blaine's behalf, and therefore, that Wasson acted on Blaine's behalf when he participated in allegedly discriminatory conduct. However, as the district court correctly observed, those documents should not be given significant weight because they predated the clarification of Blaine's management structure in the revised version of its Operating Agreement.

21

parties' consent that one party "shall act on [the other's] behalf and subject to [the other's] control").

Even if we assume, without deciding, that vicarious liability may be asserted in the context of a Section 1981 claim,[7] Carnell's argument fails. The plain language of the DSA grants the Housing Authority sole responsibility for managing construction of the project as an independent contractor. The DSA also explicitly forecloses any ability to construe the relationship of Blaine and the Housing Authority as that of principal and agent, by specifying that the Housing Authority was not an agent or employee of Blaine.

The DSA provides, in relevant part, that "[n]othing herein contained shall be construed to constitute any party as the agent of another party," and that "[the Housing Authority] shall not at any time be deemed an employee of [Blaine]." Such clear expressions of intent in the governing contract persuade us that an agency relationship was not established between Blaine and the Housing Authority. See, e.g., Causey v. Sewell Cadillac-

---

[7] Contrary to Carnell's characterization of the holding in General Building Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 395 (1982), the Supreme Court did not decide in that case that the doctrine of respondeat superior applied to Section 1981 lawsuits. However, a concurring opinion suggested that a defendant could be held vicariously liable for the discriminatory conduct of another party if the record contained evidence that the defendant "maintain[ed] some control over [that party's] activities." Id. at 404 (O'Connor, J., concurring).

22

Chevrolet, Inc., 394 F.3d 285, 290 (5th Cir. 2004) (affirming dismissal of a car dealership's § 1981 claim against an automobile manufacturer because relevant documents show that the dealership is an independent business); Arguello v. Conoco, Inc., 207 F.3d 803, 807-08 (5th Cir. 2000) (reasoning that the "plain language" of contracts between an energy company and its individual gas stations specified that each station was an "independent business" and therefore foreclosed an agency relationship).  Indeed, we discern no evidence in the record to suggest that Blaine actually controlled any of the regular operations of the Housing Authority.

Accordingly, we conclude that the district court correctly determined that Blaine could not be held liable on Carnell's race discrimination claims on either a direct or a vicarious basis.  We therefore affirm the court's award of summary judgment to Blaine with respect to those claims.

C.

We turn now to consider one of Carnell's principal arguments on appeal, namely, that the district court committed reversible error by allowing defense counsel to use certain impeachment material in cross-examining Carnell's president, Michael Scales.  We review for abuse of discretion the district court's decision to permit counsel to impeach Scales with portions of a document that Carnell contends should not have

23

been allowed for any purpose under the Federal Rules of Evidence. See United States v. Grimmond, 137 F.3d 823, 831 (4th Cir. 1998).

The document at issue is the unsigned proposal prepared by McGuireWoods. As stated above, Scales testified that he did not recall viewing the document, which delineated objectives to "[s]hape the initial story so that it is sympathetic to Carnell and critical of [the Housing Authority]," and to "[e]xpand on the initial story in Danville to garner broader interest in the case in neighboring counties, and potentially statewide interest." Before questioning Scales concerning this content, defense counsel asked Scales whether he was trying to "shape" the evidence to "make out a race claim." Scales denied these accusations and later explained that he had sought the assistance of media relations consultants from McGuireWoods "to tell who we are."

Carnell argues that defense counsel's use of the McGuireWoods proposal was unfairly prejudicial under Federal Rule of Evidence 403, because the defendants improperly used the proposal to attack Scales's credibility when there was no evidence showing that Scales had adopted, or even had read, the proposal's contents. Carnell also asserts that the proposal should have been excluded under Federal Rule of Evidence 613(b), which limits the admissibility of a witness's prior inconsistent

24

statement. In response, the defendants fail to address the Rule 403 question, and solely argue that their use of the proposal constituted proper impeachment by a prior inconsistent statement.

We find no merit in the defendants' argument. Rule 613(b) provides that "[e]xtrinsic evidence of a witness' prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." The defendants' argument fails at the outset, because even if counsel's cross-examination of Scales about a statement in the proposal constituted "[e]xtrinsic evidence" within the meaning of Rule 613(b), the defendants did not establish that the contents of the proposal qualified as a prior statement of Scales.

For a statement to qualify as a witness' prior inconsistent statement under Rule 613(b), the statement must be one that the witness has made or adopted, or to which the witness otherwise has subscribed. See United States v. Barile, 286 F.3d 749, 757-58 (4th Cir. 2002) (indicating that a third party's statement only is admissible under Rule 613(b) if the statement was adopted by the witness or otherwise is "reasonably attributable" to the witness); see also United States v. Saget, 991 F.2d 702, 710 (11th Cir. 1993) ("[W]e conclude that a witness may not be

25

impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own.").

The record before us does not contain evidence that the substance of the proposal reasonably was attributable to Scales. Instead, the record shows that Scales denied any recollection of the proposal and stated that he did not sign the document. Moreover, the proposal, which was dated February 22, 2010, had not been incorporated or referenced in the February 24, 2010 consulting agreement executed by Scales. Also, when Scales signed and returned the consulting agreement to McGuireWoods, he did not refer to any proposal in his cover letter. Given these undisputed facts, the record lacked any foundation for treating the proposal as a prior inconsistent statement attributable to Scales.

We further observe that Rule 613(b) "speaks only to when extrinsic proof of a prior inconsistent statement is inadmissible; it says nothing about the admissibility of such evidence." United States v. Young, 248 F.3d 260, 268 (4th Cir. 2001). Because the district court ruled that evidence of the proposal could be used for impeachment purposes during cross-examination, we turn to consider Carnell's argument that the district court abused its discretion by failing to exercise its gatekeeping authority to exclude the evidence under Rule 403.

26

See id. (stating that "even if all the foundational elements of Rule 613 are met" a district court "may still exercise its discretion to exclude" evidence of a prior inconsistent statement under Rule 403). In support of its position, Carnell contends that the evidence lacked probative value and was unfairly prejudicial, particularly in view of the types of claims being litigated. We agree with Carnell's argument.

Among other things, Rule 403 provides for the exclusion of otherwise relevant evidence if the "probative value" of the evidence is "substantially outweighed" by "unfair prejudice" that will result from its admission. Fed. R. Evid. 403. An assessment of probative value under Rule 403 requires more than a determination that the evidence is "relevant" to a material fact in the case. Rather, the trial court must assess the proponent's need for admission of the evidence in the full evidentiary context of the case. Old Chief v. United States, 519 U.S. 172, 184-85 (1997).

After evaluating the marginal probative value of the proposed evidence, the trial court then must balance the value of the evidence against the harmful consequences that may result from its admission. See United States v. Ham, 998 F.2d 1247, 1252 (4th Cir. 1993). Foremost among those dangers is the risk of "unfair prejudice," which refers to an undue tendency of evidence to influence a jury to make a decision for reasons

27

unrelated to the probative value of the evidence.  United States v. Mohr, 318 F.3d 613, 620 (4th Cir. 2003) (internal quotation marks and emphasis omitted); Mullen v. Princess Anne Volunteer Fire Co., Inc., 853 F.2d 1130, 1134 (4th Cir. 1988); see Old Chief, 519 U.S. at 180.  Rule 403 provides for the exclusion of unfairly prejudicial evidence only when the risk of unfair prejudice "substantially" outweighs the probative value.  See Mohr, 318 F.3d at 620.

In applying the Rule 403 analysis to the district court's decision in this case, we consider the evidence in the "light most favorable to [the] proponent, maximizing its probative value and minimizing its prejudicial effect."  Mullen, 853 F.2d at 1135 (citation and internal quotation marks omitted).  We first examine the probative value of the evidence at issue.  Notwithstanding the deferential standard of review, we conclude that any impeachment value of the quoted statements from the McGuireWoods proposal was negligible given the lack of foundation for those statements.

As we have stated above, no evidence was adduced to show that Scales had read, let alone endorsed, the proposal.  Indeed, after counsel quoted the proposal's language, Scales protested that he was unfamiliar with the proposal and did not subscribe to its contents.  Moreover, Scales already had testified that he had hired McGuireWoods in connection with the litigation to help

28

tell Carnell's story to the public. Because the proposal was an internal document prepared by McGuireWoods that contained only "propose[d]" goals for McGuireWoods's relationship with Carnell, the proposal's negligible probative value was diminishingly small absent any evidence that Scales approved or otherwise adopted its contents.

On the other hand, the danger that unfair prejudice would result from allowing counsel to quote from the proposal was exceedingly high. In allowing the impeachment, the district court lent legitimacy to an unfounded attack on Scales's credibility based on a statement that was not his own. Although the court earlier had excluded evidence of the proposal from the defendants' case-in-chief, the well-recognized problem remained that juries find it difficult to distinguish between impeachment and substantive evidence, and that, consequently, "there is a significant danger of prejudice where evidence is adduced for impeachment purposes that could not be presented directly on the merits of the case." United States v. MacDonald, 688 F.2d 224, 234 (4th Cir. 1982) (citing United States v. Morlang, 531 F.2d 183, 190 (4th Cir. 1975)). Under the present circumstances, because the impeachment evidence had little or no probative value and the danger of unfair prejudice was very great, we conclude that the court's decision to allow the use of this impeachment evidence against Scales was an abuse of discretion.

Moreover, we are not persuaded by defendants' argument that any error was harmless because use of this impeachment material was merely a "minor episode" in a lengthy trial. See Taylor v. Va. Union Univ., 193 F.3d 219, 235 (4th Cir. 1999) (holding that the harmless error test "appropriately focuses upon 'whether the error itself had substantial influence'" on the judgment) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)), abrogated on other grounds, Desert Palace Inc. v. Costa, 539 U.S. 90 (2003). On the contrary, the defendants' entire theory of the case was that Scales and his subordinates fabricated race discrimination claims to conceal poor contractual performance. To the extent that the defendants could attribute the contested language in the proposal to Scales, the defendants' theory of the case would be significantly bolstered because the document revealed a plan to "shape" the credibility of Carnell's discrimination claims.

Defense counsel ultimately was allowed to impeach Scales with the proposal as if it were his own prior inconsistent statement. The defendants took full advantage of this windfall during closing argument, when counsel referred the jury to a poster exhibit displaying the proposal's language to illustrate the defense theory that Carnell's discrimination claims were manufactured, despite the fact that the proposal was never formally admitted into evidence.

30

We find it difficult to envision circumstances more unfairly prejudicial and damaging to Carnell's race discrimination claims. We express no opinion, however, whether the error so pervaded the proceedings to require remand of Carnell's contract claims, because Carnell represented at oral argument in this appeal that Carnell is only asking for a new trial on its race discrimination claims based on this evidentiary error. Therefore, we vacate the district court's judgment with respect to Carnell's race discrimination and retaliation claims, and proceed to review the remaining issues on appeal involving Carnell's contract claims.

## III.

Carnell presents several arguments related to the damages awarded on its breach of contract claims. We first consider Carnell's arguments concerning its claims for unpaid work.

### A.

In addressing the amount of damages that could be recovered under Carnell's unpaid work claims, we review certain provisions of the Virginia Public Procurement Act (VPPA), Virginia Code §§ 2.2-4300 through 4377. The VPPA governs public contracts in Virginia and was enacted, among other reasons, to ensure "that public bodies in the Commonwealth obtain high quality goods and services at reasonable cost," and "that all procurement

procedures be conducted in a fair and impartial manner." Id. § 2.2-4300(C). Here, we consider: (1) whether the record contains evidence that Carnell provided sufficient notice of its unpaid work claims under the VPPA's notice requirement; and (2) whether the VPPA's monetary cap on modifications to public contracts limits Carnell's recovery on its contract claims.

1.

The defendants argue that Carnell's unpaid work claims are barred by Carnell's failure to offer evidence at the third trial that Carnell complied with the VPPA's notice requirement. Under the statute, "written notice of the contractor's intention to file a claim shall be given at the time of the occurrence or beginning of the work upon which the claim is based." Id. § 2.2-4363(A). At the third trial, unlike in the first two trials, Carnell did not offer into evidence a November 2009 letter notifying the Housing Authority of "claims arising from Carnell's work on the [project]." Instead, Carnell offered into evidence an October 2008 letter, which sought reimbursement for two particular instances of uncompensated work.[8] Carnell argues

---

[8] Carnell briefly argues that the Housing Authority's actual knowledge of the unpaid work claims substantially satisfied the VPPA's notice requirement. However, because the Supreme Court of Virginia has rejected this position with respect to a similar statutory notice requirement, we do not discuss further that argument. See Commonwealth v. AMEC Civil, LLC, 699 S.E.2d 499, 506 (Va. 2010) ("We hold that actual notice cannot satisfy the (Continued)

32

that the October 2008 letter independently supplied adequate proof of notice under the VPPA. We disagree.

The VPPA's written notice requirement is a "mandatory, procedural requirement[]" that must be met before a court can reach the merits of a claim. Dr. William E.S. Flory Small Bus. Dev. Ctr., Inc. v. Commonwealth, 541 S.E.2d 915, 919 (Va. 2001). Any notice submitted for purposes of satisfying this statutory requirement must identify specifically each claim for damages and "conspicuously declar[e] that, at least in the contractor's view, a serious legal threshold has been crossed," and that the contractor intends to claim reimbursement for the particular damages. Commonwealth v. AMEC Civil, LLC, 677 S.E.2d 633, 641 (Va. Ct. App. 2009), rev'd in part on other grounds, 699 S.E.2d 499 (Va. 2010). Although the notice need not exhibit "the sophistication of a legal pleading," the notice must "clearly and timely state[] the contractor's intention to later file an administrative claim." Id.

In its pleadings, Carnell alleged numerous claims for unpaid work. In the relevant section of its third amended complaint, Carnell requested, among other things, damages for cleaning out a sediment pond, removing excess dirt from

---

written notice requirement in [Virginia] Code § 33.1-386(A), and that written notice is required.") (citation omitted).

33

foundation work and materials left by another contractor, performing additional seeding, relocating a fire hydrant, implementing various plan revisions, correcting environmental deficiencies, incurring additional surveying costs, and performing work on sidewalks, ramps, and driveway entrances.

By contrast, the October 2008 correspondence, on which Carnell relies, refers to a very limited class of grievances. In the letter, Michael Scales protested that Carnell was not compensated for work required "to clean out the sediment pond #3 located on the north side of the Seeland Road construction site for the second time," and "to enter, remove siltation material, and leave the property of Ms. Juanita Edwards." As "redress," Scales requested reimbursement in the October 2008 letter for the referenced work, which he defined as the "efforts of the Contractor to get an approved stabilization plan for the north side of Seeland Road and the associated removal of the sediment from the area located on the north side of [the] Seeland Road construction site." No mention was made in the October 2008 letter of the litany of other unpaid work claims described in Carnell's third amended complaint.

Under Virginia law, Carnell satisfied its notice requirements under the VPPA only with respect to the claims for which Carnell specifically requested reimbursement and signified an intent to file a claim. See AMEC Civil, 677 S.E.2d at 641.

34

Therefore, we conclude that Carnell's October 2008 letter supplied the required notice only with respect to expenses associated with cleaning out the sediment pond and removing sediment from the north side of the specified construction site.[9] Further, with regard to those two aspects of the project, we are unable to discern from the record the particular amounts that the jury awarded as compensation for that work. Accordingly, we vacate the district court's judgment with respect to Carnell's contract claims for unpaid work, and remand the two contract claims referenced in the October 2008 letter to the district court for a new trial on those claims on damages only.

2.

We next consider the district court's decision to reduce the amount of damages awarded on the unpaid work claims based on the VPPA's limitation of the amount by which public contracts lawfully can be increased. Under the VPPA,

---

[9] The defendants claim that these issues were addressed by the Housing Authority's approval of two change orders that authorized additional expenditures to rectify the underlying problems with the construction site. On the record before us, we are unable to ascertain with certainty the amounts and nature of the work reimbursed and how they correspond to the amounts sought in the October 2008 letter. Nor are we in a position to make factual findings on that point. Accordingly, we express no opinion on that issue and leave it to the parties to present their arguments on partial or full payment for these two surviving unpaid work claims to the district court upon remand.

35

> [a] public contract may include provisions for modification of the contract during performance, but no fixed-price contract may be increased by more than twenty-five percent of the amount of the contract or $50,000, whichever is greater, without the advance written approval of . . . the governing body, in the case of political subdivisions. In no event may the amount of any contract, without adequate consideration, be increased for any purpose, including, but not limited to, relief of an offeror from the consequences of an error in its bid or offer.

Virginia Code § 2.2-4309. Carnell raises three challenges to the applicability and constitutionality of the statute, all of which lack merit.

First, Carnell asserts that the VPPA does not cap all recoveries on contract claims, but solely those in which a contractor has increased the contract price excessively without providing additional work. Seizing on the part of the statute that prohibits any increases to contracts "without adequate consideration," id., Carnell argues that the VPPA should not limit increases to Carnell's contract, which were justified by the valuable consideration of additional work performed by Carnell.

We disagree with Carnell's argument. We conclude that on its face, the statutory cap plainly applies to all fixed-price public contracts and forbids an increase to any such contract that exceeds a proportion of the contract's price. A contrary conclusion would permit the absurd result of allowing Carnell to

36

recover, through a lawsuit, an amount that Carnell could not lawfully have obtained through a mutually-agreed modification of the contract terms. Cf. Scofield Eng'g Co. v. Danville, 126 F.2d 942, 947 (4th Cir. 1942) (denying quantum meruit recovery on a contract when the contract was forbidden by statute, and citing "the absurdity of implying an obligation to do that which [the law] forbids") (citation omitted).

Carnell separately asserts, however, that even if the VPPA limits all fixed-price public contracts, Carnell's contract with the Housing Authority was a unit-price contract to which the VPPA does not apply. Under the parties' contract, the Housing Authority agreed to pay Carnell "for the performance of the Contract, in current funds, subject to additions and deductions as provided in the Contract Documents, the sum of $793,541.00." Carnell argues that because the total contract price was "subject to additions and deductions," and because Carnell agreed to perform the site preparation work "for the above lump sum and unit prices," this contract language demonstrates that the contract was negotiated on a unit-price basis. We disagree.

The district court's determination that the parties entered into a fixed-price contract is well supported by the record. Michael Scales represented in the signed, notarized bid form, which was incorporated into the contract, that Carnell sought to perform the site preparation work "for the firm, fixed price"

37

specified. Although the contract contained some conditional language allowing modifications to the final contract price, such a mechanism for negotiating modifications did not transform a contract that proposed a "lump sum" payment into a unit-price contract. Therefore, we conclude that the parties' contract was a fixed-price contract subject to the modification limits imposed by the VPPA.

Finally, Carnell argues that the VPPA's statutory cap unconstitutionally abrogates the common law in the Commonwealth of Virginia, and constitutes an unlawful taking and a due process violation under both the Federal and Virginia Constitutions. See U.S. Const. amend. V; U.S. Const. amend. XIV, § 1; Va. Const. art. I, § 11. In essence, Carnell contends that the VPPA is unconstitutional because it permits the government to obtain the benefit of a contractor's additional labor pursuant to contract modifications without being required to pay fully for that additional work. Again, we disagree.

We adopt the district court's reasons for rejecting Carnell's constitutional challenges under state and federal law. In doing so, we agree with the district court that the VPPA only affects the remedy available for certain breach of contract actions under the common law, not the validity of the underlying contractual obligations. See Etheridge v. Med. Ctr. Hosps., 376 S.E.2d 525, 532 (Va. 1989) (stating that "[o]ne area in which

38

the General Assembly's authority has not been forbidden or restricted is the common law," and that "the legislature has the power to provide, modify, or repeal a remedy"). Carnell was presumed to be aware of statutory limitations on the Housing Authority's power to modify contracts. See American-La France & Foamite Indus., Inc. v. Arlington Cnty., 178 S.E. 783, 784 (Va. 1935) ("All persons dealing with a municipal corporation are charged with notice of the limitations upon its power. Those limitations may not be exceeded, defeated, evaded, or nullified under guise of implying a contract.") (citation and internal quotation marks omitted). Moreover, Carnell had no fundamental right, nor "property, in the constitutional sense," to a particular remedy in contract. See Gibbes v. Zimmerman, 290 U.S. 326, 332 (1993); Etheridge, 376 S.E.2d at 531 (citing Duke Power Co. v. Carolina Envt'l Study Grp., 438 U.S. 59, 83-84 (1978)). Thus, the VPPA provisions at issue are constitutional because they reasonably are related to the legitimate government purpose of promoting fair procurement procedures by which public bodies in Virginia obtain goods and services at a reasonable cost. Virginia Code § 2.2-4300(C); see Etheridge, 376 S.E.2d at 531; see also Duke Power Co., 438 U.S. at 83-84 (holding that economic regulations generally are presumed constitutional unless the legislature's judgment is "demonstrably arbitrary or irrational").

Accordingly, we affirm the district court's application of the VPPA in reducing Carnell's damages on its claims for unpaid work. On remand, therefore, when the district court considers the proper measure of damages for the two items for which Carnell proved it had provided the requisite VPPA notice, the court must also ensure that any damages Carnell may be awarded do not exceed the VPPA's statutory cap.

B.

We next address Carnell's argument that the district court erred in limiting the types of damages that Carnell could recover on its breach of contract claims for being removed unjustly from the construction project. After the jury returned a verdict awarding Carnell $400,000 on its claims alleging unjust removal, the district court allowed Carnell to recover certain of those damages, including $12,000 in lost profits from not being able to complete the site preparation work and $60,490 in "retainage" withheld by the defendants, but ruled that Carnell insufficiently had pleaded "consequential or special damages" accounting for the remainder of the damages award. According to the court, such consequential damages included the alleged destruction of Carnell's business, loss of good will, and attorneys' fees and other expenses related to third-party claims. On appeal, Carnell argues that the foregoing items were not consequential damages under Virginia law, but that, even if

40

those claimed damages were consequential or special in nature, they were pleaded sufficiently in the third amended complaint.

In Virginia, the issue whether the contested damages are direct or consequential damages presents a question of law. See Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 214 S.E.2d 155, 160 (Va. 1975). Under Virginia law, direct damages are those that "flow 'naturally' from a breach of contract; i.e., those that, in the ordinary course of human experience, can be expected to result from the breach, and are compensable." R.K. Chevrolet, Inc. v. Hayden, 480 S.E.2d 477, 481 (Va. 1997); see also Long v. Abbruzzetti, 487 S.E.2d 217, 220 (Va. 1997) (analyzing whether damages were a "direct and necessary consequence" of the breach).

By contrast, consequential damages "arise from the intervention of 'special circumstances' not ordinarily predictable and are compensable only if it is determined that the special circumstances were within the contemplation of the parties to the contract." R.K. Chevrolet, 480 S.E.2d at 481 (citation omitted). We agree with the district court that because the damages sought by Carnell did not flow directly from the defendants' decision to remove Carnell from the project, they were consequential in nature. See, e.g., Atl. Purchasers, Inc. v. Aircraft Sales, Inc., 705 F.2d 712, 716 n.4 (4th Cir. 1983) (barring a claim for attorney's fees because the party

41

"failed to state specifically the claim for fees in the complaint").

Although state law governs our determination of the nature of damages sought, the procedural requirements for pleading damages are governed by the Federal Rules of Civil Procedure. See Hogan v. Wal-Mart Stores, Inc., 167 F.3d 781, 783 (2d Cir. 1999) (observing that state substantive law applies in determining whether the elements of special damages are met, but that "[t]he form in which claims for special damages must be stated is a procedural question governed by Fed. R. Civ. P. 9(g)"); see also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 3d § 1311, at 361-62 (2004). Federal Rule of Civil Procedure 9(g) requires that "special" damages, namely, those that are not the "ordinary result" of the conduct alleged, "shall be specifically stated." Weyerhaeuser Co. v. Brantley, 510 F.3d 1256, 1266 (10th Cir. 2007); see also Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1226 (7th Cir. 1995) (defining special damages as "damages that are unusual for the type of claim in question—that are not the natural damages associated with such a claim"). The primary purpose of Rule 9(g) is one of notice, both to "inform defending parties as to the nature of the damages claimed in order to avoid surprise; and to inform the court of the substance of the complaint." Great Am. Indem. Co. v. Brown, 307 F.2d 306, 308

(5th Cir. 1962). Our conclusion that the damages cited above were consequential in that they were "not ordinarily predictable," R.K. Chevrolet, 480 S.E.2d at 481, compels the further conclusion that those damages were "unusual for the type of claim in question" and, therefore, were special damages subject to the heightened pleading requirement of Rule 9(g). Avitia, 49 F.3d at 1226.

We agree with the district court that under these circumstances, Carnell's third amended complaint failed to plead special damages in connection with its breach of contract claims. In particular, we note the contrasting level of detail between the relief requested for the alleged breaches of contract and that requested for the alleged racial discrimination and retaliation. In each of the race discrimination and retaliation counts, Carnell specifically recited damages for, among other things, "harm to its name and reputation, the loss of integrity and good will, . . . , the time and expense of defending Carnell's name and reputation, . . . , and other compensatory damages to be proven at trial." By contrast, Carnell's breach of contract count merely prayed for aggregate damages "in an amount to be proven at trial but not less than $419,575, plus interest."

Carnell argues, nevertheless, that the breach of contract count in its third amended complaint incorporated certain

43

paragraphs from the complaint's introductory section that sufficiently alleged Carnell's special damages. In the relevant sections, Carnell stated that it was damaged by the "[d]efendants' conduct," by the costs relating to "investigating and defending [the defendants'] claims and causes of action," and by "the harm to its name and reputation." However, Carnell's declaration that it was injured failed to convey clearly that Carnell sought special damages with respect to those injuries as part of its contract claims. In particular, we credit the district court's statement at the damages hearing that "it is beyond dispute that notice for these sums, for these costs, for these expenditures, was not given." Accordingly, we affirm the district court's judgment with respect to Carnell's failure to plead special damages on its claims that it was unjustly removed from the project.

IV.

In summary, we conclude that the district court correctly held that Carnell had standing to assert race discrimination claims against the Housing Authority, and that Blaine could not be held liable for the misconduct alleged in those claims. We further hold that the court's decision to allow defense counsel to use the McGuireWoods proposal to impeach Scales was reversible error. Therefore, with respect to Carnell's race discrimination and retaliation claims against the Housing

44

Authority, we vacate the district court's judgment and remand the case for a new trial.

We additionally hold that the district court properly restricted Carnell's recovery on its contract claims by concluding that the VPPA limited damages on the claims for unpaid work, and that Carnell had failed to plead special damages on its claims that it was unjustly removed from the project. However, we conclude that the VPPA further limited the scope of relief available on Carnell's claims for unpaid work to the two claims raised in Carnell's October 2008 letter. Accordingly, with regard to Carnell's contract claims for unpaid work, we vacate the district court's judgment and remand the case for a new trial on damages limited to the two claims raised in the October 2008 letter.

AFFIRMED IN PART,
VACATED IN PART AND REMANDED,
VACATED IN PART AND FINAL JUDGMENT.

45

FLOYD, Circuit Judge, concurring in part and dissenting in part:

I join the majority's well-reasoned opinion in its entirety except as to the three paragraphs of Part II.B pertaining to Blaine's potential liability as a direct discriminatory actor. For the reasons that follow, I respectfully dissent on this issue and would remand the case for trial, or at a minimum, for additional briefing at the summary judgment stage.

As best I can glean from the record, Wasson is an individual who wears multiple hats: he is both the President of Danville Housing Corporation (DHC), Blaine's managing member, and Executive Director of the Housing Authority. Despite these separate corporate designations, Wasson works out of the same office (e.g., same physical address, same telephone number, etc.) when he acts on behalf of both DHC and the Housing Authority. As Blaine's managing member, DHC—and thus impliedly Wasson, in his role as DHC's President—"ha[s] full, exclusive and complete charge of the management of the business of [Blaine]" pursuant to Blaine's amended 2008 Operating Agreement. (J.A. 2445.) Additionally, it is undisputed that the Housing Authority's Board of Commissioners is identical to DHC's Board of Directors. In sum, the upper-level management personnel who wield decision-making power for both the Housing Authority and Blaine (by way of DHC) appear to be concentric, or at a minimum exhibit a substantial overlap.

As the majority opinion correctly notes, Blaine provides funding to the Housing Authority for the Project, and the Housing Authority, in turn, distributes those funds to the project contractors, including Carnell.  Accordingly, pursuant to Blaine's organizational structure and DHC's ability to act unilaterally on Blaine's behalf,[1] distribution of funds to the Housing Authority is essentially controlled by DHC.  Thus, even discounting in their entireties the letters that Wasson (allegedly erroneously) signed as Blaine's President, see ante at 21 n.6, Wasson appears to nevertheless control Blaine's (and thus the Housing Authority's, and thus Carnell's) purse strings in a back-door fashion.  To wit, in his dual roles as Executive Director of the Housing Authority and as President of DHC, Wasson is both puppet and puppeteer of the funding operation for the project.

Based on the aforementioned relationships, Blaine may be liable pursuant to a theory similar to (although perhaps not

---

[1] Blaine's amended Operating Agreement provides as follows:

[T]he Managing Member [DHC] is fully authorized, without the requirement of any act or signature of the other Members, to take any action of any type and to do anything and everything which a managing member of a limited liability company organized under the Uniform [Limited Liability Company] Act may be authorized to take or do thereunder . . . ."

(J.A. 2449 (emphasis added).)

47

exactly the same as) "cat's paw" (or "rubber-stamp") liability, which "impos[es] liability upon an employer for the discriminatory motivations of a supervisor, even though the supervisor did not formally take the adverse employment action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 288 (4th Cir. 2004); see Smith v. Bray, 681 F.3d 888, 897 n.3 (7th Cir. 2012) ("In the law of employment discrimination, the 'cat's paw' theory can apply when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." (citation omitted) (internal quotation marks omitted)). Here, the cast of characters is as follows: Blaine (via DHC, and ultimately, Wasson) as the biased shell entity that lacks decision-making power to distribute funds to the project contractors, and the Housing Authority as the duped formal decision-maker that took the adverse employment actions (at least on paper) at Blaine's behest. Although Carnell did not advance this precise theory relating to Blaine's liability for direct discrimination, Carnell did put all of the pieces in place to connect these dots—namely, the massive overlap between Housing Authority personnel and DHC personnel and the fact that Wasson holds positions of authority within each entity. For example, in arguing that Blaine should be held directly liable, Carnell asserted that "money [for the project] was funneled

48

through [the Housing Authority], but the funds originated with Blaine." (Carnell Reply Br. at 29.)

In my view, we do not know from the record exactly which entity—the Housing Authority or Blaine (by way of DHC)—Wasson was acting on behalf of when he took certain actions adverse to Carnell, and it is simply too easy for Blaine to look the other direction and to rely exclusively upon Wasson's self-serving deposition testimony that he was acting on behalf of the Housing Authority "at all times."[2] (E.g., Appellees' Opening Br. at 32.) As the nonmovant in the summary judgment proceedings, it is not Carnell's burden to show that Blaine acted in a discriminatory manner and, based on the foregoing relationships, I do not think that Blaine has met its own burden of "showing that there is an

_____

[2] Appellees, in their recitation of the facts in their Opening/Response brief, state the following:

> Under Section 14.2 of the Operating Agreement, Blaine's members granted a limited power of attorney to the president of its managing member, DHC, to sign the Operating Agreement and certain other legal documents. Pursuant to the limited authority granted by the power of attorney, DHC's president, Garry [sic] Wasson signed the Operating Agreement. The Operating Agreement also contemplated [the Housing Authority]'s involvement in the Project as the developer, and so Wasson signed on behalf of [the Housing Authority] as its Executive Director.

(Appellees' Opening Br. at 7 (emphasis added).) These actions by Wasson, although facially insignificant, are exemplary of Wasson taking off his DHC (i.e., Blaine) hat and putting on his Housing Authority hat with little to no appreciation for the distinction between his dual roles at each entity.

49

absence of evidence to support [Carnell]'s case." Kitchen v. Upshaw, 286 F.3d 179, 181 (4th Cir. 2002) (explaining the burden-shifting framework at summary judgment). To the same extent that we hold in this opinion that Carnell has an imputed racial identity (and thus standing to sue) based upon its president and members, it follows that a defendant company can likewise maintain an imputed racial bias based upon its membership. Although this analysis requires us to peel back an additional layer off of the Blaine onion than off of the Carnell onion—i.e., because Blaine has no individual employees or officers, we must instead look to the individual employees of Blaine's managing member—all roads ultimately lead back to the same individuals, and particularly Gary Wasson.

Although I do not think that there is sufficient evidence before us to reverse the district court's grant of summary judgment to Blaine, I do think that the blurriness of Wasson's multiple roles (and the overlap of other individuals, as well, namely the members of DHC's Board and the Housing Authority's Board, respectively) is an issue for a jury to consider at trial, or an issue that, at the least, warrants additional briefing and consideration at the summary judgment stage. Accordingly, I would vacate the district court's grant of summary judgment to Blaine on Carnell's theory of direct

50

liability and respectfully dissent from the majority's holding

pertaining to the same.